BARNEY, Respondent, v. BOARD OF RAILROAD COMMISSIONERS et al., Appellants.

(No. 6,932.)

(Submitted May 16, 1932. Decided June 25, 1932. Resubmitted November 14, 1932. Redecided December 19, 1932.)

[17 Pac. (2d) 82.]

116

Mr. L. A. Foot, Attorney General, and Mr. Francis A. Silver, Counsel for the Board of Railroad Commissioners, for Appellants, submitted a brief; Mr. Silver argued the cause orally.

118

*Mr. Ralph J. Anderson* and *Mr. John J. Jewell,* for Re-spondent, submitted a brief; *Mr. Anderson* argued the cause orally.

122

*Messrs. Clift & Glover,* for the Great Northern Railway Company; *Messrs. Murphy & Whitlock,* for the Chicago, Milwaukee, St. Paul & Pacific Railroad Company; *Mr. D. M. Kelly,* for the Butte, Anaconda & Pacific Railway Company; *Mr. John E. Corette,* for the Oregon Short Line Railroad Company; *Mr. George W. Pierson,* for the Montana-Wyoming & Southern Railway Company; *Messrs. Gunn, Rasch, Hall & Gunn,* for the Northern Pacific Railway Company, Counsel submitting a brief and *Mr. Milton C. Gunn* arguing the cause orally.

*Mr. E. G. Toomey,* for the Brotherhood of Locomotive Engineers, The Order of Railway Conductors, The Brotherhood

of Railroad Trainmen, and the Joint Legislative Board representing Railroad Employees, submitted a brief.

*Messrs. Johnston, Coleman & Jameson,* for the Motor Transit Company, the Baker Transfer & Storage Company, and *Mr. I. F. Hay,* submitted a brief, *Mr. Wm. J. Jameson, Jr.,* arguing the cause orally.

*Messrs. Speer & Hoffman,* for the Montana Automobile Association.

*Mr. J. B. C. Knight,* for the Intermountain Transportation Company, submitted a brief.

MR. JUSTICE GALEN delivered the opinion of the court.

Decision in this case was handed down last June; all the members of the court concurring in an affirmance of the judgment. In due time after the opinion was promulgated the defendants filed a motion for rehearing, and a number of corporations and associations asked leave to present arguments as *amici curiae.* As the questions involved are of great public importance, we determined to set the cause down for re-argument and to permit the *amici curiae* to be heard. After extended argument and much study, and having the advantage of decisions rendered since the cause was submitted originally, notably one by the United States supreme court, we are convinced that in deciding the case we considered the problem in a too restricted aspect. Upon more mature consideration we are convinced that while the Act is subject to criticism in some particulars, it does not impinge upon the fourteenth amendment, nor is it otherwise violative of constitutional provisions; therefore, the original opinion is withdrawn and this one substituted. For a better understanding of the conclusions herein reached, we will restate the case and the determinative question presented for decision.

. The plaintiff is engaged in transporting property under contract for hire by motor-truck from Lewistown to Billings

by way of Roundup, and from Lewistown to Harlowton. He does not hold himself out as a common carrier or as willing to carry property for others than those with whom he has contracts, and has refused to transport property for numerous persons and corporations. He made applications before defendant board for certificates to carry on this service between the points named as a contract carrier under plan C provided for by Chapter 184, Laws of 1931, paying the proper fee and furnishing the required information.

Written protests were filed by the Chicago, Milwaukee, St. Paul & Pacific Railway Company, the Great Northern Railway Company, and the Railway Express Agency, Incorporated, in which it was averred that the transportation business was insufficient in the territory specified in the applications to justify the existence of new and additional carrier facilities; that the service was already adequate and convenient and the public convenience and necessity did not require the proposed service, and that the facilities furnished by the railways and express company would be impaired by reason of loss of revenues if the applications were granted.

Plaintiff thereupon filed with the board a motion to strike the allegations from the protests, alleging that for stated reasons they constituted no ground for denying the applications. A hearing was had before the defendant board at which, over the objections of plaintiff, evidence was heard in support of the allegations of the protests. Thereafter the board denied plaintiff's applications on the ground that public convenience and necessity did not require the services proposed by plaintiff, and ordered that he cease transporting property by motor vehicle for compensation between those points. Thereupon plaintiff brought this action, alleging the foregoing facts, to restrain the board and its officers from enforcing its order and from prohibiting plaintiff from using the highways as proposed by him in the conduct of his business, and as he had theretofore been using them. To the complaint defendants filed a general demurrer, which was overruled. Defendants declined to further plead, and suffered judgment to be en-

tered in favor of plaintiff for the relief demanded by him, from which they appealed.

The appeal presents the sole question of the validity of Chapter 184, Laws of 1931, in so far as it authorizes the Board of Railroad Commissioners to exclude private carriers from the use of the highways.

1. The title of the Act (Chap. 184, Laws 1931) provides "for the Supervision, Regulation and Control of the Use of the Public Highways of the State of Montana by Motor Carriers Engaged in the Transportation * * * of Persons and Property *for Hire* Upon the Public Highways of the State of Montana," and therein it is declared that by the Act it is intended to confer "Jurisdiction Over Such Transportation, Motor Vehicles *and Their Operations,* Upon the Board of Railroad Commissioners." Thus its purpose is made plain. And in the body of the Act it is expressly declared that "nothing in this Act shall be construed as converting or attempting to convert a private carrier into a common carrier, and it is hereby declared that this Act is intended primarily as a regulation of the public highways of the State of Montana." (Section 22.)

Motor carriers are placed in three classifications designated A, B and C. Classes A and B, as in the Act defined, embrace common carriers, not necessary to be here considered, while "Class C" carriers embrace "all motor carriers operating motor vehicles for distributing, delivering or collecting wares, merchandise, or commodities, or transporting persons, where the remuneration is fixed in and the transportation service furnished under a contract, charter, agreement, or undertaking." (Section 2 of the Act.) And such carriers are prohibited from operating on the public highways of the state without first having obtained from the Board of Railroad Commissioners "a certificate that public convenience and necessity require such operation." (Section 10.)

While not to be commended as a model piece of legislation, it is our duty to uphold rather than condemn the Act,

unless its constitutionality appears beyond a reasonable doubt. (*Herrin* v. *Erickson*, 90 Mont. 259, 2 Pac. (2d) 296; *Arps* v. *State Highway Commission*, 90 Mont. 152, 300 Pac. 549; *State ex rel. Diederichs* v. *State Highway Commission*, 89 Mont. 205, 296 Pac. 1033; *Martien* v. *Porter*, 68 Mont. 450, 219 Pac. 817; *State ex rel. Mills* v. *Dixon*, 66 Mont. 76, 213 Pac. 227.) "We recognize, of course, that against the challenge of its validity a state statute cannot stand upon legislative declaration alone. (*Foster-Fountain Packing Co.* v. *Haydel*, 278 U. S. 1, 49 Sup. Ct. Rep. 1, 73 L. Ed. 147; *Ribnik* v. *McBride*, 277 U. S. 350, 48 Sup. Ct. Rep. 545, 72 L. Ed. 913, 56 A. L. R. 1327; *Burns Baking Co.* v. *Bryan*, 264 U. S. 504, 44 Sup. Ct. Rep. 412, 68 L. Ed. 813, 32 A. L. R. 661; *Frost* v. *Oklahoma Com.*, 278 U. S. 515, 49 Sup. Ct. Rep. 235, 73 L. Ed. 483; *Tyson* v. *Banton*, 273 U. S. 418, 47 Sup. Ct. Rep. 426, 71 L. Ed. 718, 58 A. L. R. 1236; *Wolff Packing Co.* v. *Court of Industrial Relations*, 262 U. S. 522, 43 Sup. Ct. Rep. 630, 67 L. Ed. 1103, 27 A. L. R. 1280.) But those cases and many others clearly establish that in all the courts, and certainly in the courts of first instance, the legislative declaration of purpose and policy is entitled to gravest consideration, and, unless clearly overthrown by facts of record must prevail." (*Stephenson* v. *Binford*, (D. C.) 53 Fed. (2d) 509, 514.)

"The rule was well stated in *Continental Baking Co.* v. *Woodring*, (D. C.) 55 Fed. (2d) 347, loc. cit. 353, wherein Judge McDermott of the Tenth Circuit said: 'When the Legislature acts within the scope of its legislative power, when no facts are disclosed as to the reasons which actuated the legislation, the presumption of constitutionality stands, unless no fair reason can be ascribed for the legislative action. (*Hardware Dealers Ins. Co.* v. *Glidden*, 284 U. S. 151, 52 Sup. Ct. Rep. 69, 76 L. Ed. 214; *O'Gorman* v. *Hartford Ins. Co.*, 282 U. S. 251, 51 Sup. Ct. Rep. 130, 75 L. Ed. 324; *Standard Oil Co.* v. *Marysville*, 279 U. S. 582, 49 Sup. Ct. Rep. 430, 73 L. Ed. 856.) That a legislative classification should stand, "if any state of facts reasonably can be conceived that would sustain it"; that the burden is on the assailant to show that

the classification is "essentially arbitrary." ' " (*Schwartzman Service, Inc.*, v. *Stahl*, (D. C.) 60 Fed. (2d) 1034, 1037.)

In the case last cited, the court had under consideration a statute of Missouri enacted in 1931 (Laws 1931, p. 304), for the purpose of regulating the use of public highways by both common and private motor carriers. (Secs. 5264–5280, both inclusive, Missouri Statutes Annotated.) There the contract carrier is required to obtain a "contract hauler permit" from the Public Service Commission as a condition precedent to operating on the public highways, and the object of such permit is to enable the Public Service Commission to determine the need of such service and the effect of such added transportation facilities "upon other transportation service being rendered." It is the duty of the court to so construe the Act as to effectuate the object of the legislature (*State ex rel. Evans* v. *Stewart*, 53 Mont. 18, 161 Pac. 309; *State ex rel. Carter* v. *Kall*, 53 Mont. 162, 162 Pac. 385, 5 A. L. R. 1309; *In re McLure's Estate*, 68 Mont. 556, 220 Pac. 527; *State ex rel. Special Road District No. 8* v. *Millis*, 81 Mont. 86, 261 Pac. 885); and the title of the Act is indicative of the legislative intent and purpose in enacting it. (*State ex rel. Smith* v. *Duncan*, 55 Mont. 376, 177 Pac. 248; *Morrison* v. *Farmers' & Traders' State Bank*, 70 Mont. 146, 225 Pac. 123.)

As further evidence of the purpose of the Act, section 25 thereof provides: "This Act shall not repeal any of the existing law or laws relating to motor-propelled vehicles and owners and operators, or requiring compliance with any condition for their operations"—which can have reference only to sections 1742 to 1763, inclusive, of the Revised Codes of 1921, and amendments thereof, relating respectively to speed and traffic regulations of automobiles, motor vehicle registration, and chauffeurs' licenses. We have no other existing laws "relating to motor-propelled vehicles * * * or requiring compliance with any condition for their operations." These existing statutes and amendments thereof, not repealed by the Act, all relate to the use of the highways. They are akin to

the purpose of the 1931 Act, and provision therein that they are not to be considered as repealed furnishes further evidence that the purpose of the 1931 Act is to further regulate the use of the highways, and is complementary and supplementary to all existing statutes on the subject which are not expressly repealed.

When these statutes are considered in their entirety, as they must be, objections which might be urged against the 1931 Act, if it stood alone, are seen to be without merit. It is true that the law as it stands does not provide regulation in particulars which members of this court may think advisable, but the extent of the regulation is a matter for legislative discretion.

2. The public highways belong to the people for use in the ordinary way. Their use for the purpose of gain is special and extraordinary, and generally may be regulated by the state. (*Packard* v. *Banton,* 264 U. S. 140, 44 Sup. Ct. Rep. 257, 68 L. Ed. 596.) And for the protection of the state highways there is no reason why private carriers, equally with public ones, should not be required to obtain certificates of public convenience and necessity from the commission. Regulation by means of such certificates is reasonably devised to protect the public from abusive use of the roads, and from the evils incident to unregulated competition. "The state has power for the safety of the public to regulate the use of its public highways. (*Hendrick* v. *Maryland,* 235 U. S. 610, 622, 35 Sup. Ct. Rep. 140, 59 L. Ed. 385; *Kane* v. *New Jersey,* 242 U. S. 160, 167, 37 Sup. Ct. Rep. 30, 61 L. Ed. 222; *Sprout* v. *South Bend,* 277 U. S. 163, 168, 48 Sup. Ct. Rep. 502, 72 L. Ed. 833, 62 A. L. R. 45.) It may prohibit or condition as it deems proper the use of city streets as a place for the carrying on of private business." (*Hodge Drive-It-Yourself Co.* v. *Cincinnati et al.,* 284 U. S. 335, 52 Sup. Ct. Rep. 144, 145, 76 L. Ed. 323.) The supreme court of the United States has sustained a state law requiring reasonable security for the protection of persons in respect of injuries and losses caused by the negli-

gent operation of motor vehicles engaged in carrying persons for hire (*Packard* v. *Banton,* 264 U. S. 140, 144, 44 Sup. Ct. Rep. 257, 68 L. Ed. 596. Cf. *Hess* v. *Pawloski,* 274 U. S. 352, 356, 47 Sup. Ct. Rep. 632, 71 L. Ed. 1091), and such measures, so far as concerns constitutional validity, are not distinguishable from the statute under consideration. And if the state determines that the use of its highways for private purposes in the usual and ordinary manner shall be preferred over their use by common carriers or private carriers, in our opinion there is nothing in the fourteenth amendment to prevent.

Heretofore this court has held, and we think correctly, that "while a citizen has the right to travel upon the public highways and to transport his property thereon, that right does not extend to the use of the highways, either in whole or in part, as a place of business for private gain. For the latter purpose no person has a vested right in the use of the highways of the state. It is a privilege or license which the legislature may grant or withhold in its discretion, or which it may grant upon such conditions as it may see fit to impose, provided the imposition applies impartially." (*State* v. *Johnson,* 75 Mont. 240, 243 Pac. 1073, 1078; *Willis* v. *Buck,* 81 Mont. 472, 263 Pac. 982.) In its proprietorship of public highways the state may withhold permission to use them, and equally it has power to prescribe the conditions under which they may be used.

"Prior to the advent of motor-driven vehicles, our roads were constructed and maintained by the several counties of the state, but thereafter it became necessary for the state, in a large measure, to take over this work and to adopt new measures for the protection of the roads constructed and to keep down the ever-mounting cost of maintenance, as well as to minimize the increased danger to persons and property in the use of the highways, and, in order to do so, it became a necessary function of government to regulate transportation of persons and property for compensation over the highways—an enterprise theretofore confined almost exclusively to rail transporta-

tion—as, if not so regulated, the appropriation of the highways as a place for the transaction of private business might eventually result in forcing the state into the position of maintaining highways for private enterprise, rather than for the public purposes for which they were established. In *Barbour* v. *Walker,* 126 Okl. 227, 259 Pac. 552, 56 A. L. R. 1049, it is declared that it was to obviate this condition, rapidly materializing, that the legislature of that state enacted a law which is, in all essential particulars, similar to our own, and that 'the principle applied in the regulation of the use of the highways for private enterprise rests upon public convenience and public necessity, a principle recognized and in a large degree applied by the national government in placing the control and regulation of the railroads of the country in the hands of the Interstate Commerce Commission.' '' (*Northern Pac. Ry. Co.* v. *Bennett,* 83 Mont. 483, 272 Pac. 987, 990.)

And it is noteworthy that the Oklahoma Act, considered in the *Barbour Case* above alluded to, is like our own statute in its requirements. (Chap. 113, Laws of Oklahoma of 1923, p. 188; *Ex parte Tindall,* 102 Okl. 192, 229 Pac. 125.)

"It is apparent that the contract motor carrier differs from the motor common carrier only in that the contract carrier does not hold itself out to carry for all the public indiscriminately, but carries for whom it chooses and at its own rates and on its own terms and conditions, and cannot be legally compelled to carry for any one, as may a motor common carrier. In addition to these differences, the contract carrier differs from the common carrier by railroad in that the contract carrier conducts *a business* for compensation on highways constructed, paid for, and maintained by the state, and constructed, primarily, for the general use by the public in the ordinary way and not as a right of way for a business for hire, while the railroad carrier conducts its business on its own way, constructed and maintained by itself and on which it pays substantial taxes." (Public Utilities Fortnightly, August 16, 1932, pp. 202, 203.)

132

Mr. Chief Justice Hughes, speaking for the supreme court of the United States in a very recent case, said a classification in the statute imposing restrictions on the operation of motor-trucks on the highways is said "to favor transportation by railroad as against transportation by motor trucks. If this was the motive of the legislature, it does not follow that the classification as made in this case would be invalid. The state has a vital interest in the appropriate utilization of the railroads which serve its people as well as in the proper maintenance of its highways as safe and convenient facilities. The state provides its highways and pays for their upkeep. Its people make railroad transportation possible by the payment of transportation charges. It cannot be said that the state is powerless to protect its highways from being subjected to excessive burdens when other means of transportation are available. The use of highways for truck transportation has its manifest convenience, but we perceive no constitutional ground for denying to the state the right to foster a fair distribution of traffic to the end that all necessary facilities should be maintained and that the public should not be inconvenienced by inordinate uses of its highways for purposes of gain. This is not a case of denial of the use of the highways to one class of citizens as opposed to another or of limitations having no appropriate relation to highway protection." (*Sproles* v. *Binford*, 286 U. S. 374, 52 Sup. Ct. Rep. 581, 587, 76 L. Ed. 1167; *Ex parte Sterling*, (Tex. Sup.) 53 S. W. (2d) 294.) The Texas statute considered by the supreme court of the United States in the *Binford Case*, above cited, constitutes a regulation of the use of public highways, the ultimate purpose of which is the same as our law, though much more elaborate in its provisions. (Chap. 277, General Laws of Texas, 1931.)

Congress is empowered to regulate, that is, to provide by law for the government of, interstate commerce, and with regard to the exercise of such power, equally applicable to the state, the supreme court of the United States has declared that the authority of Congress, "extending to these interstate

carriers as instruments of interstate commerce, necessarily embraces the right to control their operations in all matters having such a close and substantial relation to interstate traffic that the control is essential or appropriate to the security of that traffic, to the efficiency of the interstate service, and to the maintenance of conditions under which interstate commerce may be conducted upon fair terms and without molestation or hindrance. As it is competent for Congress to legislate to these ends, unquestionably it may seek their attainment by requiring that the agencies of interstate commerce shall not be used in such manner as to cripple, retard, or destroy it.'' (*Houston, E. & W. Texas Ry.* v. *United States,* 234 U. S. 351, 34 Sup. Ct. Rep. 833, 836, 58 L. Ed. 1341.)

In a very recent decision in a well-considered case, involving a statute regulating the use of public highways, by both common and private carriers, the supreme court of Florida gave expression of its views concerning the constitutionality of the law and its application, which we approve, and deem most pertinent here. It said that: ''A contract entered into by a private contract carrier involving continuous and recurring carriage for compensation under it, involves a legally enforceable *contractual* obligation on the part of such private contract carrier to make a general and continuous use of the public highways in order to perform the contract. Such continuous and recurrent use of the public highways for private gain under special contract is no different *in its relationship* to other vehicular traffic and other transportation conditions which may be affected by it, than the *relationship* which exists between a common carrier making the same kind of continuous and recurrent use under its public and legal, as distinguished from its contractual, obligation so to do. * * * The test of validity as to regulations imposed on private contract carriers operating in continuous and recurrent carriage under the same contract, is whether or not the regulations imposed are *appropriate* for this kind of carrier. If the regulations imposed are *appropriate,* and are not unjustly discriminatory against private contract carriers as a class, merely because

they are such carriers, and they do not unduly interfere with the right of property management of such carriers, nor require them to agree to assume unwilling and unconstitutional burdens, as a condition precedent to enjoying an otherwise enjoyable legal right given to them, the statute imposing such regulations is not rendered invalid by the mere fact that the same, and no greater regulations, are likewise imposed on common carriers, or by the circumstance that none of them are imposed upon other classes of private contract carriers, not operating in continuous and recurrent carriage on the public highways of the state." (*Riley* v. *Lawson*, (Fla.) 143 South. 619, 626.)

The Florida statute is likewise an Act in regulation of motor carriers on the public highways, and requires all persons who shall operate any motor vehicle for the transportation of persons or property over the public highway to first obtain a certificate of public convenience and necessity from the Railroad Commission. (Chap. 14764, General Laws of Florida 1931.)

"Self-preservation, said to be the first law of nature, is the foundation of the police power, and the highest duty owed by a sovereign state to its citizens is to provide for their security, and to protect them in the enjoyment of those comforts and conveniences which they are taxed to provide (12 C. J. 907), and the theory that the state is powerless to prevent the appropriation of its highways, dedicated to the use of the entire public, by persons using the same for the transportation of freight or passengers for hire to such an extent that they may be destroyed or rendered so unsafe that the general public cannot use them except at great peril, is utterly inconsistent with the powers of a sovereign state." (*Rutledge Co-op. Assn.* v. *Baughman*, 153 Md. 297, 138 Atl. 29, 33, 56 A. L. R. 1042.) The Maryland statute is very similar in its requirements to our Act. (Sec. 258 of Article 56, Bagby 1929 Supp. to Ann. Code.)

In a decision of the supreme court of the United States, rendered December 5, 1932, on appeal from the district court

of the United States for the southern district of Texas, in the case of *Stephenson* v. *Binford,* 53 Fed. (2d) 509, hereinbefore cited in this opinion, it is noted that the decision of the district court is affirmed. (53 Sup. Ct. Rep. 181, 187, 77 L. Ed. ———.) Speaking for the supreme court, Mr. Justice Sutherland indicates that the Texas statute was assailed upon the same grounds assigned in the case before us, and says: "These and other findings and the evidence contained in the record conclusively show that during recent years the unregulated use of the highways of the state by a vast and constantly growing number of private contract carriers has had the effect of greatly decreasing the freight which would be carried by the railroads within the state, and, in consequence, adding to the burden upon the highways. Certainly, the removal or amelioration of that burden, with its resulting injury to the highways, interference with their primary use, danger, and inconvenience, is a legitimate subject for the exercise of the state legislative power. And that this was one of the chief ends sought to be accomplished by the provisions in question, the record amply establishes.

"The assailed provisions, in this view, are not ends in and of themselves, but means to the legitimate end of conserving the highways. The extent to which, as means, they conduce to that end, the degree of their efficiency, the closeness of their relation to the end sought to be attained, are matters addressed to the judgment of the legislature, and not to that of the courts. It is enough if it can be seen that in any degree, or under any reasonably conceivable circumstances, there is an actual relation between the means and the end. (Compare *McCulloch* v. *Maryland,* 4 Wheat, 316, 409, 410, 419, 421, 423, 4 L. Ed. 579; *Veazie Bank* v. *Fenno,* 8 Wall. 533, 549, 19 L. Ed. 482; *Legal Tender Cases,* 12 Wall. 457, 539, 540, 541, 542, 543, 20 L. Ed. 287; Pomeroy, Constitutional Law, 9th ed., sec. 268a.) * * *

"Debatable questions of this character are not for the courts, but for the legislature, which is entitled to form its own judgment. (*Sproles* v. *Binford,* 286 U. S. 374, 388, 389, 52

Sup. Ct. Rep. 581, 76 L. Ed. 1167.) Leaving out of consideration common carriers by trucks, impairment of the railway freight service, in the very nature of things, must result, to some degree, in adding to the burden imposed upon the highways. Or, stated conversely, any diversion of traffic from the highways to the railroads must correspondingly relieve the former, and therefore contribute directly to their conservation. There is thus a substantial relation between the means here adopted and the end sought. This is made plain by the *Sproles Case*, supra (page 394 of 286 U. S. 52 Sup. Ct. Rep. 581, 587)."

In the case of *Frost & Frost Trucking Co.* v. *Railroad Com.*, 271 U. S. 583, 46 Sup. Ct. Rep. 605, 70 L. Ed. 1101, 47 A. L. R. 457, relied upon by the plaintiff, regulation of the use of highways by carriers was not involved; but rather, whether a private carrier may be compelled against its will to assume the burdens and duties of a common carrier. The opinion in that case clearly recognizes that the requirement of a certificate of public convenience and necessity by a private or contract carrier is within the legislative power of the state.

It is to be noticed that the Act is to be applied equally to all Class C operators, all such being required, as a condition precedent to use of the highways, to make application for and obtain a certificate of public convenience and necessity from the Board of Railroad Commissioners, which certificate will be issued only after notice given to persons likely to be affected, and a public hearing. Essentially it is a regulation of the right of persons to enter upon and use state-owned highways for personal gain. The power to regulate the use of motor vehicles on the public highways rests upon the state's ownership of them and the burden it assumes in their creation and maintenance. The right of the state to regulate is based upon two grounds: (1) The nature of the business; and (2) the use of the highways in connection therewith. When the public highways are made the place of business, the state has the right to regulate their use in the interest of the safety and convenience of the public, as well as the preservation of

the highways. Without the use of the public highways the business in which the plaintiff is engaged and his profits therefrom would be impossible. These highways have been constructed at enormous public expense, and the operation of heavy trucks upon them, whether as common or private carriers, subject them to severe wear and tear, and unless constantly repaired soon become impassable, and the operation of powerful trucks with large projecting bodies laden with freight is a constant menace to the safety of the traveling public, unless such operation be subjected to reasonable state supervision.

Since the state may withhold the privilege of using its highways as a place of business for private gain, and the denial of a mere license to so use the same deprives no one of any property or vested property right, it follows that the state may prohibit unnecessary use of its highways for private gain, thereby giving protection to its property and the public safety. In *Buck* v. *Kuykendall*, 267 U. S. 307, 45 Sup. Ct. Rep. 324, 325, 69 L. Ed. 623, 38 A. L. R. 286, it is said: ''With the increase in number and size of the vehicles used on a highway, both the danger and the wear and tear grow. To exclude unnecessary vehicles—particularly the large ones commonly used by carriers for hire—promotes both safety and economy. State regulation of that character is valid.''

''The power to select, limit, and prohibit uses of the highways by carriers for hire, which is implied in the requirement of a certificate of public convenience and necessity, is justified both as a regulation of the business, and as a regulation for the protection and safety of the highways. There is thereby no unequal protection of law, but a reasonable classification. Complainant does not show that it is likely to be deprived of any liberty or property without due process of law, but only of a privilege on a highway to which he has no constitutional or statutory right.'' (*Southern Motorways* v. *Perry*, (D. C.) 39 Fed. (2d) 145, 147.)

The requirement of securing a certificate of public convenience and necessity for doing business on the public high-

ways may be reasonably applied to private carriers for compensation for the privilege of transporting for hire on the public roads of this state, in the exercise of the police power and to conserve the proper use of the highways, and therefore the plaintiff is deprived of no constitutional right by requiring him as a condition to his operations as a private or contract carrier over the public highways to first apply for and obtain a certificate of public necessity and convenience from the Board of Railroad Commissioners as required by the statute.

In our opinion the Act constitutes a proper exercise of the police power of the state in the regulation of the use of the public highways by contract carriers, and is not to be condemned under the provisions of the fourteenth amendment to the Constitution of the United States, or like provisions embodied in section 27 of Article III of the Constitution of the state of Montana. The plaintiff is not denied the equal protection of the law or the right of contract, nor is he deprived of his property without due process of law.

For the reason stated, the judgment is reversed and the cause remanded to the district court of Fergus county, with directions to dismiss the plaintiff's complaint.

Remittitur will issue forthwith.

MR. CHIEF JUSTICE CALLAWAY and MR. JUSTICE MATTHEWS concur.

MR. JUSTICE ANGSTMAN, Dissenting: I am not able to subscribe to the majority opinion as applied to the statute under consideration. I concede that much of the opinion announces correct principles of law when applied to a statute that is in truth and in fact one for the purpose of regulating the use of public highways in the interests of public safety, or the preservation of the highways, but the Act under consideration before us is not, in my opinion, such an Act, and in consequence the majority opinion is rested upon a false premise as to the purpose of our statute.

In considering the question of the validity of the Act it must be remembered that it is challenged, not by one who is complaining of its regulatory provisions, but by one who is denied the right to use the highways in question regardless of his willingness to abide by all regulations that may be imposed. In other words, we are concerned here only with the right of exclusion upon the ground of public convenience and necessity. Conceding that it is competent for the legislature to exclude private carriers from the use of the highways in order to protect the highways from excessive use or in the interest of public safety, the Act before us has no such purpose.

It is true that the title of the Act contains the preliminary declaration that it is one providing for the "Supervision, Regulation and Control of the Use of the Public Highways." Also section 22 of the Act, in an effort to proclaim that the Act is one which it is not, declares: "This Act is intended primarily as a regulation of the public highways of the State of Montana." It will not do, of course, to say that the insertion of these words in section 22 was an idle and useless formality. They were put there for some reason. If the Act otherwise disclosed its purpose to be that of regulating the use of the public highways, of course this declaration would be useless. But since there was nothing else in the Act from which it would be recognized or identified as one to regulate the use of the highways, this declaration of purpose was obviously incorporated in the Act with the hope that such declaration would save the Act. But the question before us is: "Are the courts bound by this declaration of purpose when it is the only thing in the Act pointing in the direction of the claim that it was designed as a means of regulating the use of the highways in the interest of public safety or for the preservation of the highways?" The answer must be in the negative. (*Foster-Fountain Packing Co.* v. *Haydel*, 278 U. S. 1, 49 Sup. Ct. Rep. 1, 73 L. Ed. 147.)

Doubtless it is competent for the legislature to make a declaration of purpose entitled to consideration by the courts

140

when the body of the Act contains provisions bearing out the avowed purpose, but I know of no rule of law which permits the legislature to make a binding declaration of purpose for a certain Act, either in the title or body of the Act, or both, different from that which the body of the Act plainly reveals, as does Chapter 184, Laws 1931.

In prescribing what the board shall take into consideration in passing upon the propriety of issuing or withholding. a certificate of public convenience and necessity, the statute provides that: "The board shall give reasonable consideration to the transportation service being furnished or that will be furnished by any railroad, or other existing transportation agency, and shall give due consideration to the likelihood of the proposed service being permanent and continuous throughout twelve (12) months of the year and the effect which such proposed transportation service may have upon other forms of transportation service which are essential and indispensable to the communities to be affected by such proposed transportation service or that might be affected thereby." (Sec. 11, Chap. 184, Laws of 1931.)

The real purpose of the Act is again reflected by section 3 which provides that, in fixing the tariff or rates to be charged by Class A and Class B carriers, the board shall take into consideration "the effect of such tariff and rates upon other transportation agencies, if any, and as far as possible avoid detrimental or unreasonable competition with existing railroad service or service furnished by a motor carrier."

And section 17 of the Act reveals something of its actual purpose. That section makes provision for the creation of a special fund to be made up of the fees and charges collected under the Act, and states: "Such fund shall be available for the purpose of defraying the expenses of administration of this Act *and the regulation of the businesses herein described.*"

It will be noted that there is not a suggestion in the Act that the board, in considering whether a certificate of public convenience and necessity should issue, should take into consideration the amount of traffic on the highway, the number

of motor-trucks already using it, the damage likely to result to the highway if the proposed service be allowed, or any other matter from which it can be said that the design in authorizing the commission to exclude private carriers from the use of the highways is to regulate the use of the highways. There is nothing in the Act that has to do with the speed of motor-trucks, their size, the weight of loads they may carry, the qualifications of the drivers, or the number of trucks that may be used on any particular road. The Act is not in any sense one to regulate the use of the highways.

As applied to the plaintiff the Act is not regulatory, but prohibitory. It has no other purpose than that of regulating competition between carriers. It was rail carriers who made the protest here. Those protests were not upon the ground that the highways were being subjected to excessive burdens, nor that the public safety was endangered by use of the trucks. We are advised by the record that the protests and objections were "that either or both of these objectors were engaged in furnishing transportation service for goods, wares and merchandise by railway and express over all of the territory covered by the applications of the plaintiff and that the transportation business was insufficient in the territory covered by the applications to justify the existence of new and additional carrier facilities and was being adequately and conveniently handled and the public convenience and necessity did not require the proposed service and that the transportation facilities furnished by the railways and the said express company would be impaired by reason of the loss of revenues resulting from the granting of said applications."

So far as we can tell there may be no motor-trucks other than the plaintiff's that use the highways in question for the purpose of transportation of freight for hire. I confess, moreover, that I am not able to follow the logic of the majority wherein they find additional evidence of the purpose of this Act to be that of highway regulation from section 25 thereof, which provides: "This Act shall not repeal any of the existing law or laws relating to motor-propelled vehicles and owners

and operators, or requiring compliance with any condition for their operations.'' This the majority say (and I think correctly) has reference to sections 1742 to 1763, which have to do with speed, chauffeurs' licenses, traffic regulation of automobiles and motor vehicle registration, all of which relate to the use of the highways. To me it seems a novel doctrine that the validity of an Act depends in any measure upon statutes already in force and which are unrepealed by the Act assailed.

Nor can I see how sections 1742 to 1763, which relate to the use of the highways can be resorted to as evidencing a like purpose for the enactment of Chapter 184, Laws of 1931, simply because the latter expressly states that it does not repeal the former.

To my mind section 25 indicates that the legislature was satisfied with the existing laws (secs. 1742 to 1763) relating to the use of the highways, and therefore did not, by Chapter 184, either amend, alter, repeal or in anywise change the previously existing laws on that subject. The fact that no change was made by Chapter 184, by implication or otherwise, in the existing laws having to do with the use of the highways, is fairly conclusive that Chapter 184 has to do with an entirely different subject. As I view it, section 25 refutes rather than sustains the claim that Chapter 184 is a measure designed to regulate the use of the highways.

In all of the cases cited in the majority opinion as sustaining statutes asserted to be similar to ours, the statutes under consideration were so essentially different from ours, that they are not authority in this case in determining the validity of our statute. Thus in the case of *Schwartzman Service, Inc.,* v. *Stahl,* (D. C.) 60 Fed. (2d) 1034, the court had before it the Missouri statute found in the Laws of Missouri 1931, page 304 (Mo. Stats. Ann., secs. 5264–5280). That Act was one to regulate the use of the highways. It empowered the Public Service Commission to promulgate safety rules and regulations and specified that those regulations shall include the following: ``(a) Every motor vehicle and all parts thereof

shall be maintained in a safe and sanitary condition at all times. (b) Every driver employed by motor carriers or contract haulers shall be at least twenty-one years of age, of good moral character, and shall be fully competent to operate the motor vehicle under his charge. (c) Accidents arising from or in connection with the operation of motor carriers or contract haulers shall be reported to the commission in such detail and in such manner as the commission may require. (d) The commission shall require and every motor carrier or contract hauler shall have attached to each unit or vehicle such distinctive marking as may be adopted by the commission. (e) No vehicle coming within the provisions of this Act shall be operated at a speed in excess of forty (40) miles per hour." It also provided that in determining whether it should issue a permit the commission shall give consideration to the kind and character of vehicles permitted over the highway.

The long quotation from *Northern Pac. Ry. Co.* v. *Bennett,* 83 Mont. 483, 272 Pac. 987, had relation to a different statute (Chap. 154, Laws of 1923), and one which did not apply to private carriers. (*Stoner* v. *Underseth,* 85 Mont. 11, 277 Pac. 437.)

The Oklahoma statute is the next one claimed by the majority opinion to be like our own. It is found in Chapter 113, Laws of 1923, and was under consideration in *Ex parte Tindall,* 102 Okl. 192, 229 Pac. 125. This Act bore evidence on its face of being one designed to promote the safety of the public and the preservation of the highways. Section 8 of the Oklahoma Act gave the Public Service Commission (there called the Corporation Commission) authority to promulgate safety rules and regulations, and required that such rules and regulations should embrace certain specified matters similar to those contained in the Missouri statute above quoted, as well as others of the same general tenor.

Reliance is placed upon the case of *Sproles* v. *Binford,* 286 U. S. 374, 52 Sup. Ct. Rep. 581, 76 L. Ed. 1167, upon the assertion that the statute there considered had the same ultimate purpose as Chapter 184. The most cursory examina-

tion of that statute, a copy of which is set forth in the footnotes in 286 U. S. 380, 52 Sup. Ct. Rep. 581, 582, 76 L. Ed. 1174 et seq., will disclose at once that that statute had to do with the weight and size of the vehicles permitted to use the highways, the weight and size of the loads permitted to be hauled, and in other respects shows that it was in truth and in fact a piece of legislation in the interest of public safety and the preservation of the highways.

The case of *Riley* v. *Lawson*, (Fla.) 143 South. 619, is relied upon and quoted from at great length. But the statute is wholly different from ours. The statute there involved required the Railroad Commission, in determining whether a certificate of public convenience and necessity should issue to a private carrier, to take into consideration "the effect of the granting of such certificate may have upon transportation facilities within the territory sought to be served by said applicant, and/or congestion of traffic on the highways, and/or safety of traffic moving on the highways under such operations in relationship to other private and/or public traffic permitted by law to move over the same roads or in the same territory, and also the effect upon transportation as a whole within said territory." It also contained three printed pages dealing with the size of trucks permitted, the weight of loads, the speed of trucks and other safety provisions. There is no similarity between that Act and Chapter 184.

The Maryland statute is claimed in the majority opinion to be very similar to ours. It was under consideration in *Rutledge Co-op. Assn.* v. *Baughman*, 153 Md. 297, 138 Atl. 29, 56 A. L. R. 1042. That Act is different fundamentally from ours. In the first place it related only to motor vehicles used in the "public" transportation of property, and had nothing to do with private carriers. It contained a section declaring in effect that transportation by a co-operative association for its stockholders shall be considered "public transportation." The court in the *Baughman Case* simply held that it was proper for the legislature to characterize such transportation as public transportation within the meaning of the Act. True, the opinion in

that case contains *dictum* as to the authority of the legislature over private carriers, but this *dictum* is predicated upon an Act designed for the safety of the public and the preservation of the highways of the state, and the case is not any authority that a statute such as Chapter 184 could be upheld as one having this purpose. The Texas statute involved in *Stephenson* v. *Binford,* (D. C.) 53 Fed. (2d) 509, affirmed by the United States supreme court on December 5, 1932, 53 Sup. Ct. Rep. 181, 77 L. Ed. ——, was also one containing provisions clearly designed to protect the highways and the public safety.

The legislature of this state in its wisdom has not yet seen the necessity of adopting legislation of the more populous states, designed to limit the number of trucks on its highways to prevent congestion of traffic. Also, thus far the legislature of this state, so far as the damage to the highways is concerned, evidently is satisfied that this is offset by the fees exacted from owners of motor-trucks and the contributions made by them in defraying the cost of building and maintaining the roads (see *Arps* v. *State Highway Com.,* 90 Mont. 152, 300 Pac. 549) by the exaction of a tax of five cents per gallon on gasoline, which, though imposed upon dealers in gasoline, is passed on directly to those who use gasoline in propelling vehicles over the highways.

The Act in question here can have no other purpose than that of curbing, or excluding, motor traffic only when it works to the detriment of another carrier, not the highway. There is no limitation in the Act as to the number of motor-trucks that may be permitted on any highway when and if their service increased the revenues or business of other carriers in the territory.

The Act under consideration here, in so far as it requires a certificate of public convenience and necessity to be measured by the effect that the issuance of the certificate would have upon existing transportation service, comes within the rule stated in *Buck* v. *Kuykendall,* 267 U. S. 307, 45 Sup. Ct. Rep. 324, 326, 69 L. Ed. 623, 38 A. L. R. 286, where the court, in

speaking of such certificate, says: "Its primary purpose is not regulation with a view to safety or conservation of the highways, but the prohibition of competition. It determines, not the manner of use, but the persons by whom the highways may be used. It prohibits such use to some persons, while permitting it to others for the same purpose and in the same manner."

The legislature, of course, has the right to regulate competition or to prohibit it, by authorizing the commission to refuse a certificate of public convenience and necessity when dealing with public utilities, and where it has the correlative right to regulate and fix the rates and charges. But it has no right to deny, or unreasonably curtail, the right to engage in a lawful private business. (See *New State Ice Co.* v. *Liebmann*, 285 U. S. 262, 52 Sup. Ct. Rep. 371, 374, 76 L. Ed. 747, decided March 21, 1932.) In that case it is said: "There is no question now before us of any regulation by the state to protect the consuming public either with respect to conditions of manufacture and distribution or to insure purity of product or to prevent extortion. The control here asserted does not protect against monopoly, but tends to foster it. The aim is not to encourage competition, but to prevent it; not to regulate the business, but to preclude persons from engaging in it. There is no difference in principle between this case and the attempt of the dairymen under state authority to prevent another from keeping cows and selling milk on the ground that there are enough dairymen in the business; or to prevent a shoemaker from making or selling shoes because shoemakers already in that occupation can make and sell all the shoes that are needed. We are not able to see anything peculiar in the business here in question which distinguishes it from ordinary manufacture and production."

If this Act can be sustained, then I know of no reason why the legislature may not, if it sees fit, authorize the Railroad Commission to prohibit transportation by airplane or pipeline wherever such service is found to affect the earnings of

the railroads, and thus confer a monopoly upon transportation by railroads.

In my opinion the requirement that a private carrier must obtain a certificate of public convenience and necessity before being permitted to use the public highways of the state not being a regulation of the use of the highways, but a prohibition of competition, and therefore a measure designed to regulate the business of those using the highways, cannot stand.

But if, by a tortured construction of the Act, we treat it as one having for its purpose the regulation of the use of the highways, it is still invalid when used as a pretext for excluding contract carriers from the highways because it is unreasonably discriminatory.

It is fundamental that, "whatever rules and regulations are made in connection with the use of highways should be reasonable, operate with equality, and have some tendency to accomplish the end in view." (*Weaver* v. *Public Service Com.*, 40 Wyo. 462, 278 Pac. 542, 548.) It must be conceded that under the Act those with whom plaintiff contracts, instead of hiring plaintiff to transport their property, could use their own trucks of the identical model, size and weight as plaintiff's, to haul the same property over the identical roads. The danger to the public safety and the damage to the highways would be identical in either case. The Act, as applied here, excludes the one and not the others from the use of the highways. There is no basis for the distinction when the right is assumed to be exercised under the authority to regulate the use of highways.

The distinction between the two classes of carriers, those operating under contract, and those carrying property which is owned by the carrier, admits of no diversity of treatment to the extent of excluding the one from the highways, and not the other. The public safety is in like manner endangered and the highways as much damaged by carriers hauling their own products as by those operating under contract.

What was said by the supreme court of Wyoming in *Weaver* v. *Public Service Com.*, supra, is here pertinent. The court

in that case said: "If it be true, as intimated by some of the cases, that a person or corporation carrying on his or its own business may not be forbidden the use of the public highways in a reasonable way, but that a private carrier for hire may be, and that arbitrarily in every case, then some strange results would follow. A groceryman in a city could not be prevented from delivering his goods to his various patrons through an employee; but no one would be permitted to make an independent contract with such groceryman to do so as a private carrier. A company operating a sugar factory at Torrington, or some other place, would be permitted to contract to purchase sugar beets at the various farms, and through one of its employees haul the beets over the public highways of this state; but no one would be permitted to make an independent contract with the factory to haul them as a private carrier. Other illustrations might be multiplied. An independent calling as a private carrier could in that manner be arbitrarily forbidden, and the only way in which it could be enjoyed would be by becoming a servant of some employer. If the legislature has that arbitrary power, then we have reverted to the time when it, like a Roman emperor, may, by the stroke of a pen, create serfs and affix them to the soil."

Freedom of contract is the general rule and is guaranteed by the Constitution, and restraints the exception. And a state may not, under the guise of protecting the public by the exercise of its police power, arbitrarily interfere with private business or prohibit lawful occupation. (*State* v. *Gateway Mortuaries, Inc.,* 87 Mont. 225, 287 Pac. 156, 68 A. L. R. 1512.)

In my opinion the Act in question transcends the power of the legislature as limited by the fourteenth amendment to the United States Constitution, and the learned trial judge properly overruled the demurrer to the complaint and properly entered judgment for plaintiff.

MR. JUSTICE FORD: I concur in the foregoing dissenting opinion of MR. JUSTICE ANGSTMAN.