Robinson, J.
 

 The record discloses that Sebring is a municipality of approximately 5,000 inhabitants and Alliance a city of approximately 25,000 inhabitants ; that the distance between the corporation
 
 *407
 
 limits of such municipalities is three miles, and the distance between the termini of the proposed bus line route is four and one-half miles; that such bus line route begins and ends at the depots of the Stark Electric Railroad Company.in the respective municipalities; that its route within the municipalities practically parallels the tracks of the Stark Electric Railroad Company; that the Stark Electric Railroad Company operates upon its own right of way outside of and between such municipalities; that its right of way between such municipalities is approximately one-half mile distant from Patterson avenue, or the Sebring-Alliance road, the public road over which it is proposed to operate the bus line; that approximately 200 families reside along Patterson avenue or the Sebring-Alliance road; that these families have no convenient access to the Stark Electric Railroad, or any other public transportation utility; that there are many persons residing in Alliance that are employed in Sebring, and some persons residing in Sebring that are employed in Alliance; that their working hours are such that about 700 such persons desire to be transported at the same time; that many of the persons residing along Patterson avenue, or the Sebring-Alliance road, are employed either in Sebring or Alliance; that the termini of the Stark Electric Railroad are at Canton and Salem, and that Alliance and Sebring are intermediate stations between such termini; that the Stark Electric Railroad operates a half-hour schedule from and to Sebring and. Alliance, with extra cars at the peak hour, the first car leaving Alliance for Sebring at 4:14 a. m., and the first car leaving Sebring for Alliance at 5:27. a. m.; that at 9 p. m. the schedule changes to an
 
 *408
 
 hourly service and discontinues at 12 midnight; that the Stark Electric Railroad Company is willing to furnish such additional transportation service as the public needs require and the public will utilize; that the Sebring-Alliance Bus Line, under various ownerships, has been operating a bus line over the proposed route since prior to the effective date of the Freeman-Collister Act; and that on the 29th day of September, 1927, the Public Utilities Commission of Ohio revoked the certificate under which it Bad been operating, for the reason that the same had been issued through a mistake upon the part of the Public Utilities Commission, which mistake was occasioned by an act of O. A. Oyster, one of the applicants for this certificate. The hitherto operation, therefore, of the Sebring-Alliance Bus Line has been unauthorized and unlawful. By reason of such operation the Public Utilities Commission was afforded rather definite data as to the number of fares that would be diverted from the Stark Electric Railroad by the granting of a certificate of convenience and necessity to the Sebring-Alliance Bus Line.
 

 The record discloses that the Sebring-Alliance Bus Line collected annually in excess of 200,000 fares, of which about 80 per cent, were terminal to terminal fares. The record further discloses that during that period the Stark Electric Railroad, with the exception of one year, was operated at a substantial loss, and that the net earnings of the excepted year were so insignificant as to in no appreciable way offset the losses of the other years. It therefore became apparent that the inevitable result of the continued failure of the Stark Electric Railroad Company to earn its operating expenses would be a loss
 
 *409
 
 to the general public, including the persons residing in Sebring and Alliance, of that public transportation service.
 

 That situation presents the question whether the granting of a certificate of convenience and necessity to a motor transportation company, which at best can only partially serve the public convenience and necessity, for the convenience of those who prefer to ride in a bus or prefer to exercise an option of riding either in a bus or in an interurban railroad car, where the granting of such certificate makes imminent the loss of an interurban railroad transportation service, which interurban railroad service can more nearly, if not fully, serve the public convenience and necessity,' is reasonable, and lawful.
 

 The Public Utilities Commission found that the convenience and necessity of the persons residing along Patterson avenue required that they have the service of this bus line, and we are in accord with such finding. It further found that at the peak transportation hour there were more persons desiring to ride from one municipality to the other than could be accommodated by the service now offered by the Stark Electric Railroad, and therefore, without giving the Stark Electric Railroad Company any opportunity to increase its service, certificated the bus line to operate an unrestricted 30-minute service from interurban depot to interurban depot.
 

 This court has repeatedly held that the purpose of the motor transportation act is to serve the public convenience and necessity as distinguished from serving the advantage and profit of m,otor transportation companies; that the public convenience and necessity are paramount to every other considera
 
 *410
 
 tion; that it is not the policy of such legislation to create destructive competition with existing transportation facilities and thereby decrease or destroy such existing transportation service and deprive the general public thereof, but, on the contrary, is the policy of such legislation to so limit and so certificate motor transportation service as to secure, to the public, service additional to the service which it already has; and that, where the certification will result in depriving the public of an equal or greater existing public transportation facility, certification of a motor transportation company route will thwart instead of serve the public convenience and necessity.
 

 While the motor transportation act does not, in terms, require the Public Utilities Commission to give existing public transportation companies, other than motor transportation companies', an opportunity to make their service adequate before certificating competing motor transportation service, Section 614-87, General Code, does provide that “before granting any certificate the commission shall take into consideration other existing transportation facilities in the territory for which a certificate is sought, and in case it appears from the evidence that the service furnished by existing transportation facilities is reasonably adequate the commission shall not grant such certificate,” and does provide that, before it issue a certificate for motor transportation service, it find “that public convenience and necessity require such operation, ’ ’ which ■ is tantamount to requiring that the Public Utilities Commission, before granting such a certificate, must not only find that the public convenience and necessity require such service, but also that the granting
 
 *411
 
 of such certificate will serve such public convenience and necessity.
 

 The public convenience and necessity require that the general public have adequate public transportation,' and while ‘ ‘ adequate ’ ’ may in certain situations mean less than existing service, in the instant case it does not so mean. If the granting of this certificate will inevitably result in less adequate service, then the granting of this certificate will not serve the public convenience and necessity. The duty, therefore, of the Public Utilities Commission in that situation was to preserve the greater transportation service and to require of it that character and degree of service that would be adequate to the public convenience and necessity.
 

 The situation disclosed by the record makes it apparent that it would be impractical and highly detrimental to the public using the public highway in the ordinary way for the bus line to serve all of the 700 persons who desire to be transported at the same time every working day. The record further discloses that the Stark Electric Railroad Company is willing to furnish additional service if it is found that its present service is inadequate.
 

 The duty of the Public Utilities Commission in the premises, therefore, was to attempt to preserve to the inhabitants of the two municipalities the public utility transportation service that would the more nearly be adequate and would the more nearly serve their needs; and since the record tended to prove that the operation of the motor transportation company would probably result in the ultimate destruction of the interurban railroad transportation, and that the motor transportation company alone could
 
 *412
 
 not as adequately serve the public convenience and necessity as the interurban railroad company alone could, it became the duty of the commission before granting an unrestricted certificate to the competing motor transportation company to give to the interurban railroad transportation company an opportunity to make its service adequate, and, in certificating the Sebring-Alliance Bus Line, to restrict its operation to a service of the persons desiring to ride from points along Patterson avenue, or the SebringAlliance road, outside' the corporate limits "of either municipality, to points in either municipality, and from points in either municipality to points along such road outside the corporate limits of both municipalities, and from point .to point along such road outside the corporate limits of both municipalities.
 

 Remanded for modification of order.
 

 Marshall, C. J., Day, Allen, Kinkade, Jones and Matthias, JJ., concur.