THE STATE at Relation and to Use of MISSOURI PACIFIC RAILROAD COMPANY and MISSOURI PACIFIC TRANSPORTATION COMPANY v. PUBLIC SERVICE COMMISSION OF MISSOURI, Appellant.—37 S. W. (2d) 576.

Division Two, March 25, 1931.

*D. D. McDonald* and *J. P. Painter* for appellant; *Crouch & Crouch* for Brown Bros. Bus Line, Inc., defendant.

*Edward J. White, Otto & Potter,* and *Thos. J. Cole* for respondents.

COOLEY, C.—Appeal by the Public Service Commission of Missouri, hereinafter referred to as the commission, from the judgment of the Circuit Court of Cole County setting aside an order of the commission refusing a joint application of respondents (applicants) for permission to withdraw certain trains and install motor bus service.

Applicant railroad company operates a line of railroad extending from Joplin, Missouri, northward to Pleasant Hill, Missouri, where it connects with the company's main line running westward into Kansas City. Applicant transportation company is a Delaware corporation, authorized to do business in Missouri, with a paid-up capital stock of $100,000, and though a separate corporate entity is referred to as a subsidiary of the railroad company, being owned by stockholders and officers of the railroad company.

Applicants presented to the commission a joint application for permission for the railroad company to withdraw from service its trains Nos. 212 and 215, operating between Joplin and Pleasant Hill, which have been operating at a loss, and for a certificate of convenience and necessity to the transportation company to operate as a motor bus carrier between Joplin and Kansas City, Missouri, over State highways Nos. 71 and 66, for the purpose, as stated in the application, of taking care of the passenger business then and theretofore handled by said two trains. Highways Nos. 71 and 66 are coincident from their junction at Carthage southwestward to Joplin, and for convenience the whole route will be referred to as 71. The highway practically parallels the railroad from Joplin to Harrisonville, some ten miles south of Pleasant Hill. From Harrisonville it runs northwestward to Kansas City, not paralleling the railroad and touching only one town on the railroad, viz., Dodson, near Kansas City. The application names two other towns, Peculiar and Belton, through

which it proposes to operate between Kansas City and Harrisonville. One witness for applicants said at the hearing that the transportation company was not asking to give service between Harrisonville and Kansas City except at Dodson, which is on a Missouri Pacific line. Another testified: "We are asking to put on two buses that will . . . serve the immediate towns between Harrisonville and Dodson."

Train 212 operates from Joplin to Pleasant Hill and from the latter point it constitutes part of train No. 47 on the main line into Kansas City. No. 212 is a local train leaving Joplin at 5:30 A. M., and reaching Kansas City at 11:30 A. M. Train 215 is operated from Kansas City to Pleasant Hill as part of main-line train No. 48 and from Pleasant Hill to Joplin as train 215. It leaves Kansas City at 5:30 P. M. It stops only at the larger places, reaching Joplin at 10:50 P. M.

Illustrative of the relative train and proposed bus schedules, applicants propose to substitute for train 215 a bus service leaving Kansas City at three P. M., and another leaving there at five P. M. The bus line now serving that part of the route has buses leaving Kansas City at 10:15 A. M., two P. M. and four P. M., eight A. M. 5:15 P. M. and 11:30 P. M., the three first named daily and the others daily except Sundays and holidays.

At the hearing before the commission applicants stated that the application for permission to the railroad company to withdraw the trains was contingent upon the granting of the application for certificate of convenience and necessity to the transportation company to install the bus service, and that if such certificate was not granted the application for permission to discontinue the trains should be considered withdrawn "so far as this hearing is concerned."

After a full hearing the commission found that public convenience and necessity did not require the granting of a certificate to the transportation company and denied the application of both applicants. Upon certiorari the circuit court set aside the order of the commission "as being unreasonable" and remanded the cause to the commission for further proceedings. It was shown at the hearing and not controverted that the transportation company was able and willing to render adequate and efficient service as a motor bus carrier if granted a certificate.

The city of Pleasant Hill filed a petition signed by seventy-nine residents protesting the abandonment of the trains and the granting of the requested certificate.

The transportation company's application for a certificate was protested by the following holders of certificates on various portions of the route, viz.: R. A. McCartney; Pickwick Stages, Inc. (interstate only); Brown Bros. Bus Lines; Capitol Stage Lines; Coin Combs,

and the Kansas City Public Service Company, the latter operating a transportation system in Kansas City and to Dodson. Petitions were filed by Brown Bros., containing the names of some 900 of their patrons residing along their route, commending the quality and character of service rendered by said bus lines and protesting the granting of a certificate to the transportation company. Petitions signed by some 180 persons favoring the abandonment of the trains and the granting of the certificate as prayed were filed by applicants. In addition, resolutions of a number of civic organizations, some favoring and some opposing the applications, were presented. It may be said generally that those favoring the applications did not complain of any inadequacy of the service being rendered by present certificate-holders or inability on their part to render any further service that might be needed, but thought that if the railroad company was losing money by operating the trains it should be permitted to substitute bus service through its subsidiary.

In its report the commission states, *inter alia*, the following:

"The testimony and exhibits on the part of the railroad company show that the revenues derived from the operation of the trains sought to be withdrawn are less than the cost of operating them. Applicants' Exhibit 1 shows that for the year 1926, the average earnings per train-mile of trains 212 and 215 was $1.32 per mile; in 1927 it was $1.08 per train-mile, and for the ten months of 1928 it was 67 cents per train-mile. Applicants' Exhibit 2 shows that for the past ten months of 1928 it cost an average of $6,460 per month to operate the two trains, or an average expenditure of 79.6 cents per mile, as against an average revenue of 67 cents per mile, or an average revenue per month of $5,461 per month, and if all expenses were included the deficit would even be greater.

"Applicants' testimony further shows that the subsidiary company was organized in order to conserve the revenues of the railroad and coordinate transportation in the territory that it serves; that by the substitution of buses it might avoid the necessity of asking for increased rates in order to overcome the losses incurred in passenger business. The evidence discloses that the cost of operation of buses would be from 25 cents to 30 cents per bus-mile, as against 79.6 cents per mile for the operation of the trains. A number of witnesses testified on behalf of applicants that in their opinion it would be a convenience and necessity to the traveling public if the transportation company was permitted to operate buses, and more particularly would this be so since the patrons would be privileged to buy tickets on the train which would entitle them to have their baggage carried by rail and the advantage of going by bus on the transportation line.

"A considerable portion of applicants' testimony was to the effect that if the railroad company is permitted to withdraw its trains, it

would be a convenience to permit the transportation company to operate buses which would serve as a substitute, or supplement to the service now being rendered by the railroad, at a less expense, and that it would promote public convenience and necessity thereby to be carried on the bus line and check heavy baggage on the railroad.

"The route over which the transportation company proposes to operate being U. S. Highway No. 71 from Joplin to Kansas City, is now and has been for some time served by bus operators duly certificated by this commission. The Brown Brothers Bus Line operates between Nevada and Kansas City, R. S. McCartney Bus Lines between Joplin and Nevada, and Coin Combs between Joplin and Carthage. The testimony on behalf of the protesting bus lines is uncontradicted that the service rendered is of a high standard of excellency, and that each of said operators is willing and financially able to add to the equipment and furnish any and all additional service that may be necessary for the convenience of the traveling public. In fact, applicants in this case make no claim of any failure upon the part of any of the certificated motor carriers to render adequate and sufficient service along the route served by each particular carrier. At page 5 of applicants' brief the following statement appears:

" 'Applicant Missouri Pacific Transportation Company is not contending that existing motor carriers do not give convenient, efficient and sufficient motor-coach service between their respective termini in accordance with the orders of the Public Service Commission.'

"The inadequacy of the existing service, and the convenience and necessity of the proposed service, should affirmatively appear from the evidence, to warrant the granting of a certificate to the applicants. On the contrary the record in this case establishes, as an evidential fact, that the existing carriers serve the general public adequately. In the case of Egyptian Trans. System v. Railroad Company, 321 Ill. 580, the court says:

" 'Appellants have stated that they are willing and able to give such service, and it appears clearly that the commission is not justified in granting a certificate of convenience and necessity to a competing line, until the utility in the field has had an opportunity to demonstrate such truth of its statement and to give the required service.'

"In the present case the motor carriers in the field have given their assurance of being able and willing to render any and all additional service necessary for the traveling public."

The finding of facts in the above excerpt is sustained by the evidence. It is conceded that there is no need of additional bus service if the two trains are not discontinued. It appears from protestants' evidence, and we think it true from all the evidence, that there is

not sufficient motor-bus business over the route in question to warrant competitive bus operation even if the two trains mentioned were discontinued, and that if another bus line were authorized all lines would probably operate at a loss or at least without profit: that the margin of profit of the present certificate holders is not large and would be wiped out by any substantial loss of business. The present operators could carry without additional equipment more passengers than they now have. Applicants virtually conceded in their testimony that they did not expect the transportation company, if granted a certificate, to operate at a profit, but contended that "where a railroad company operates a bus and can save on the train service more than the cost of the operation of the busses, they are in a stronger position to make something out of the bus operations than an independent company. It would be a saving to take the trains off and run the busses in event we did not carry a passenger."

In regard to checking of baggage, applicants' testimony was: "If it was not checked on the train ahead (of the bus taken by the passenger) the baggage would follow the next day. It would be worth something to a traveling man under this circumstance as he does not need big heavy trunks in the small towns and he checks them ahead of him."

The evidence does not indicate that there had been serious complaint of the present bus lines not handling baggage transportation satisfactorily.

Applicants' evidence was that there was no agreement or understanding between them that losses, if any, sustained by the transportation company in operating its proposed bus line would be compensated or shared by the railroad company, or that profits, if any, would go to or be shared by the railroad company.

The Motor Bus Act, Laws 1927, page 402, et seq., Sections 5264-5281, Revised Statutes 1929, makes motor carriers operating over regular routes between fixed termini common carriers and places them under the supervision, regulation and control of the Public Service Commission, as other utilities. They may not operate as such carriers without first obtaining a certificate of public convenience and necessity from the commission. If, upon hearing of the application for a certificate, "the commission shall find from the evidence that public convenience and necessity will be promoted by the creation of the service proposed . . . a certificate therefor shall be issued;" and: "In determining whether or not a certificate of convenience and necessity should be issued, the commission shall give reasonable consideration to the transportation service being furnished by any railroad, street railway or motor carrier, and shall give due consideration to . . . the effect which such proposed

transportation service may have upon other forms of transportation service." [Sec. 5267, R. S. 1929.]

If this were a case in which a railroad company, directly or through a subsidiary, and one or more independent motor carriers were each applying for a certificate to operate over a highway paralleling the railroad and on which duly certificated motor carriers were not already operating, we would have a different situation with which to deal. Such was the situation in most of the cases cited and relied upon by respondents, and in such case there is strong and appealing argument in favor of giving preference to the railroad company or its subsidiary. As argued by respondents, the railroads have helped greatly to develop the country, they have large investments, can assure permanency of service and satisfaction for injuries from accidents, and they pay large sums in taxes. But, while such is true, other duly authorized public utilities are also entitled to consideration. As said in Monongahela West P. S. Co. v. State Road Commission (W. Va.), 139 S. E. 744, 748: "The holder of the permit over the established route is entitled to the same protection and consideration as any other public utility." To hold otherwise would be unwise policy as well as unjust.

We have not such situation in this case. Here we have duly certificated motor carriers already in the field, furnishing adequate and satisfactory service, willing and able to furnish any additional facilities and service which may be needed or which the commission may order. They began, under certificates from the commission, when the highway was not so good and the demand for bus service less and they have built up their transportation system to a high state of efficiency, serving and evidently capable of continuing permanently to serve the public adequately. Applicant transportation company now seeks to enter the field in competition with the existing motor carriers, because, while applicants disclaim a desire to compete for business now done by the certificated carriers, there can be no doubt that there would be such competition. If granted a certificate the transportation company would inevitably take an appreciable amount of such business, enough, we are satisfied, to reduce the profits of the present motor carriers to the vanishing point. The transportation company, while it has little or no expectation of making a profit out of the motor carrier business if granted a certificate, would of course endeavor to do so. It is willing to operate without profit if no profit can be made, in order to save to the railroad company the cost of operating the trains. The present carriers cannot do that. Either rates would have to be raised to compensate for the loss of their passengers or these carriers would be forced to quit. Should the certificate applied for be granted, then, in order that all certificated carriers operating over the route might make a reasonable profit, rates would inevitably have to be raised.

In State ex rel. Elec. Co. v. Atkinson et al., 275 Mo. 325, 335, 204 S. W. 897, it was said:

"This is an era in which we, in a large measure, if not fully, realize a necessity for the conservation of energy and of natural resources. Such conservation is better secured by the regulation of public utilities than by their duplication . . . And the requirement of a finding of necessity, as well as of public convenience, further implies that if another utility is adequately rendering the service proposed, or is able and willing or may be required to do so, then the necessity would not exist and the certificate should be refused."

In the same case, 275 Mo. l. c. 337, it is further said that, conceding that the Public Service Commission Act is indicative of a policy designed in every proper case to substitute regulated monopoly for destructive competition, the "spirit of this policy is the protection of the public. The protection given the utility is incidental. The policy covers a particular case when competition would impair or destroy a utility and, as a consequence, eventually entail an increase of rates charged the public. There are other considerations, of course, but that mentioned forms the principal basis of the rule."

Useless duplication of service tends to destroy itself, to cripple existing systems, commit waste and impair the public service, and fails to furnish permanent satisfactory service at fair rates. [See Pond on Public Utilities (3 Ed.) sec. 731, p. 778.]

The commission's power with respect to granting certificates of convenience and necessity to motor carriers is defined by the statute above referred to. In State ex rel. Detroit-Chicago Motor Bus Co. v. Pub. Serv. Comm., 23 S. W. (2d) 115, 117, this court said:

"It will be noted that the Commission's discretion is to be controlled by three principal considerations: (1) The transportation service being furnished by other carriers: (2) the permanency and continuity of the proposed service; and (3) the effect which the proposed service may have upon other existing forms of transportation service. The statute in this respect is in complete harmony with the general principles which obtain as to state regulation of public utilities."

Upon review of an order of the commission refusing a certificate, if the court finds the order of the commission neither unlawful nor unreasonable, it is its duty to affirm the order. [State ex rel. Detroit-Chicago Motor Bus Co. v. Pub. Serv. Comm., supra; State ex rel. Mo. Pac. Railroad Co. v. Pub. Serv. Comm. (Mo), 297 S. W. 47; State ex rel. Power Co. v. Pub. Serv. Comm., 287 S. W. 522.] The question then is, was the order of the commission unlawful or unreasonable?

So far as the applicant Missouri Pacific Transportation Company is concerned there can be no doubt that, upon the facts shown, the order of the commission refusing it a certificate was not unreasonable or unlawful.

Neither do we think it was unreasonable or unlawful as to applicant Missouri Pacific Railroad Company. The application for permission *to discontinue the trains,* the refusal of which is complained of in respondents' brief here, cannot be considered as a separate and independent proposition because at the hearing before the commission the railroad company expressly made that application contingent upon the granting of the transportation company's application for a certificate, stating that if the latter were not granted its application to withdraw the trains would be withdrawn so far as this hearing is concerned.

Applicants' position seems to be that the joint application was in effect an applicaton by the railroad company for permission to discontinue the 'trains and, through a subsidiary, to substitute therefor motor bus service. We think it unnecessary to discuss the question whether or not it would be unreasonable. to refuse permission merely *to substitute* for train service operated at a loss a different and cheaper form of transportation when and if such substitution could be effected without increasing existing competitive conditions as to other established transportation agencies. It is clear that granting the application in this case would amount to more than a mere substitution of motor bus transportation for abandoned train transportation. It would, as above pointed out, result in increased competition with established motor-bus service which the business and public necessity do not justify, and would inevitably prove detrimental to and probably destructive of the now established motor carrier agencies, to the ultimate detriment, we think, of the public convenience and interests.

Should the railroad company desire only to discontinue the trains since they cannot be operated without loss, that is a matter to be presented to the commission.

We have not overlooked the authorities cited by respondents, but we think the principles announced in them are not in conflict, the facts considered, with the conclusion we have reached herein. Most of them, as stated above, deal with original applications the granting of which would not conflict with an established service. One, which is cited as being in point, Re Southern Pac. Motor Transport Co. (Cal.), P. U. R. 1929A, 193, was a petition to the railroad commission by a railroad company and a subsidiary corporation the stock of which was owned by the railroad company, to withdraw certain trains and for a certificate to the transportation company to operate motor coaches on certain highways paralleling the railroad on which there was already established motor service. So

far the facts are similar. The certificate was granted. But the commission found that there was no carrier operating in the same general territory, "performing the identical service applied for;" that the proposed service would be self-sustaining; that it would not *"in any way increase the competitive situation* thereofore existing between the railroad company and auto carriers then operating in the general territory, and that the results of such proposed service will be merely to permit the railroad company, either by itself or through its subsidiary, to continue to perform a necessary service *without financial loss to any carrier operating in the territory."* (Italics ours.)

It is apparent that the facts as found by the California commission as to the results of granting the certificate, upon which it based its action, differ materially from the situation presented in this case.

We do not regard the fact that the present motor carriers may not now be rendering the *identical* service applied for as of great importance, in view of the fact that they are willing and able, and may be required, to render such service as will be in all respects adequate.

We are of the opinion that the order of the commission as to both applicants was neither unlawful nor unreasonable and that the judgment of the circuit court setting it aside should be reversed and the cause remanded with directions to that court to enter judgment affirming said order of the commission. It is so ordered. *Davis, C.,* concurs; *Westhues, C.,* not sitting.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All of the judges concur.