FULMER, APPELLANT, v. BOARD OF RAILROAD COMMISSIONERS ET AL., RESPONDENTS.

(No. 7,132.)

(Submitted November 21, 1933. Decided January 9, 1934.)

[28 Pac. (2d) 849.]

*Messrs. Brown, Wiggenhorn & Davis* and *Messrs. Toomey & McFarland,* for Appellant, submitted an original and a reply brief; *Mr. R. G. Wiggenhorn, Mr. Horace S. Davis* and *Mr. E. G. Toomey* argued the cause orally.

*Mr. Raymond T. Nagle,* Attorney General, and *Mr. Francis A. Silver,* for Respondent Board of Railroad Commissioners submitted a brief; *Mr. Silver* argued the cause orally.

*Messrs. Gunn, Rasch, Hall & Gunn,* for Respondents Northern Pacific Railway Company and Northern Pacific Transport Company, submitted an original and supplemental brief; *Mr. Milton C. Gunn* argued the cause orally.

*Mr. S. C. Ford, Amicus Curiae,* submitted a brief and argued the cause orally.

MR. JUSTICE STEWART delivered the opinion of the court.

This action was instituted in the district court of Yellowstone county by virtue of the provisions of sections 3803–3810, Revised Codes 1921, for a review of acts of the board of railroad commissioners.

On February 28, 1931, Harry W. Fulmer, plaintiff and appellant, filed with the board his application for a certificate to authorize him to operate motor vehicles for the transportation of freight over the highway between Billings and Miles City and intermediate points. Before his application was acted upon, the law under which he filed (Chap. 154, Laws 1923) was repealed and a new law known as Chapter 184, Laws 1931, was enacted by the Twenty-Second Legislative Assembly. The application was never acted upon by the board before the effective date of the new law, July 1, 1931.

On July 6, 1931, Fulmer began to operate over the route, as he testified, "to determine whether or not the route was practical." He operated until about August 17, 1931. On July 20, 1931, he filed another application under the provisions of the new law. This application was noticed and a hearing thereon was held by the board on August 21, 1931. On the day of the hearing the Northern Pacific Transport Company, one of the respondents herein, filed an application to operate motor trucks over the same line for the transportation of freight. Subsequently, and before either application was acted upon, both applicants amended to include passenger service.

Fulmer's application was designated as docket No. 1105, and the application of the transport company was numbered 1162. Announcement of the transport company filing was made at the beginning of the Fulmer hearing, and a request was made that no final action be taken in the Fulmer matter until the other application could be considered by the board. Fulmer's attorney objected to hearing the transport application at that time, for the reason that no notice thereof had been given, and requested the board to move to a determination of the Fulmer

application without reference to the other application. The examiner for the board ruled that no evidence would then be received concerning the transport company application. The hearing proceeded solely upon the Fulmer application, and at the close thereof the matter was taken under advisement.

On September 10 the application of the transport company was heard and evidence received. On October 30 the board made an order denying the Fulmer application and finding that public convenience and necessity did not require the proposed motor freight operation by Fulmer. At the same time and in the same order the board stated that because the proposal of the transport company involved a curtailment of passenger train service, a matter not before the board in the instant proceeding, but one which under the established practice of the board could only be determined in a direct proceeding for that purpose, further proceedings in the transport company application were continued and postponed.

On November 4 the railway company filed application to discontinue two of its trains, Nos. 187 and 188, between Billings and Forsyth. This application recited that it was made for the purpose of accomplishing large economies in operating costs and as a part of the general plan of the company to accomplish all possible economies in its operating department, and that, if permission for the discontinuance was granted and a permit issued to the transport company to operate motor freight and passenger service over the highway between the points mentioned above pursuant to the application of the transport company, the railway company would substitute train service for motor service at any and all times the motor service could not be operated by reason of weather or other conditions. The application was heard on November 13 and on the 30th thereafter the board made an order permitting the discontinuance of the trains upon the institution by the transport company of motor vehicle highway service for the transportation of persons and property between Billings and Miles City, the same to be effective December 20, 1931. On the same date, "on further consideration," the board ordered a certificate of

convenience and necessity to issue to the transport company. It is admitted that the transport company is a subsidiary of the railway company and all of its stock is owned by the latter company.

Thereafter Fulmer instituted this action in the district court against the board, the Attorney General, the railway company and the transport company. The complaint contains two causes of action. It recites a history of the matters, involved in the several applications and orders, and in addition thereto contains allegations to the following effect:

That the board found that public convenience and necessity required an authorization of the freight, express and passenger service proposed by the plaintiff, but instead of awarding the certificate therefor to him, it awarded a certificate to the transport company without any showing that the service proposed by that company would better meet the requirements and needs of the public or would be in any way superior to that offered by plaintiff; that the board capriciously, arbitrarily and in defiance of the requirements of the law awarded the certificate to the transport company, and that such act was an unjust and unwarranted preferment of the transport company; that the service proposed by the transport company was wholly impractical as a passenger service and was not a substitute for the previously existing passenger service afforded by trains Nos. 187 and 188; that by awarding the certificate to the transport company the board denied to plaintiff the right to install and operate motor service because it would unduly compete with existing rail service, and at the same time permitted the removal of the obstacle of the competing rail service to justify the allowance of inferior motor service to the railway company's subsidiary; that there was no evidence in the record to support the order; that the evidence proved that plaintiff's application was grounded on public convenience and necessity; that the board acted arbitrarily and capriciously in favor of the railway company and the transport company, and only considered their interests and desires, and refused to consider the interests of plaintiff or the public.

28

The complaint contained allegations to the effect that Chapter 184, Laws 1931, did not require or permit the board, in passing upon matters and elements of public convenience and necessity, to consider or give heed to the financial necessities of the railway company or to apply as a test of public convenience and necessity for motor vehicle operation in a given territory, the fact that a rail carrier may operate motor vehicles through a subsidiary agency in such a manner as to decrease the losses, if any, from the rail carrier's operation, and that no showing of such facts was made, and that consideration of the financial necessities of the railway company was without warrant or authority of law, without proof thereof, and without regard for the rights of the public.

It is further alleged that Chapter 184, Laws 1931, violates section 27, Article III, of the Constitution of Montana and the Fourteenth Amendment of the Constitution of the United States, in that there is no provision therein for a judicial review of the acts and determinations of the board and the decisions thereof; that the Chapter as interpreted by the board violates section 6, Article XV, of the state Constitution, in that it attempts to accomplish by evasion the requirement that parallel transportation companies shall be competitive in fact; that the Act violates section 27, Article III, of the Constitution of the state and the Fourteenth Amendment of the Federal Constitution, in that it exempts motor vehicles and operators transporting school children and those engaged exclusively in logging or mining operations under certain circumstances enumerated in the Act.

Separate answers were filed by each of the defendants and issues thereby joined. Before trial the parties entered into a stipulation whereby it was agreed that the cause should be submitted to the court upon the transcripts, records and files of the board of railroad commissioners in the applications and dockets of the parties to the action as heretofore set out. The cause was submitted on such transcripts, records and files, but before decision plaintiff, over the objection of defendants, was

permitted to reopen his case for submission of further testimony to the effect that on July 1, 1932, a bridge on the highway over which the transport company operated its trucks was condemned and motor transportation by that company discontinued over part of the route from that day to about August 25, 1932, and that during that time no through substituted rail service was established. Defendants, however, showed to the court that motor vehicles were operated over part of the route and regular railway trains were utilized as substitutes.

On September 19, 1932, the court made its order denying the relief demanded by plaintiff, and on October 25 thereafter entered judgment accordingly. Plaintiff then appealed to this court and a stipulation was entered into between the parties transmitting all transcripts, exhibits and records used in the lower court to this court for its consideration. These voluminous transcripts and records were thereupon made a part of the record in this case and have all been considered by us.

The specific relief demanded by plaintiff in the district court was, in effect, that the orders of the board denying his request for a certificate of convenience and necessity, and the order granting such a certificate to the transport company be annulled and set aside, and that the board be directed to grant a certificate to plaintiff, and that all of the defendants, including the board, be restrained from interfering with his operation under the certificate.

It will be observed from the allegations of the complaint that the action is really against the board. The other defendants are merely nominal parties.

Plaintiff assigns seventeen specifications of error. It is not necessary to discuss each assignment separately. The specifications are substantially contained in three propositions, as follows:

1. Is Chapter 184, Session Laws of the Twenty-Second Legislative Assembly, constitutional?

2. Did the action of the board contravene section 6, Article XV, of the Montana Constitution?

3. Did the board proceed and determine the applications within the terms of, and in accordance with, Chapter 184, supra?

It is not necessary to enter into a lengthy discussion of authorities for the purpose of determining the constitutionality of Chapter 184, Laws 1931. That question was decided by this court in the case of *Barney* v. *Board of Railroad Commissioners,* 93 Mont. 115, 17 Pac. (2d) 82, 88. In that case, in speaking of that Act, the court said: "In our opinion the Act constitutes a proper exercise of the police power of the state in the regulation of the use of the public highways by contract carriers, and is not to be condemned under the provisions of the Fourteenth Amendment to the Constitution of the United States or like provisions embodied in section 27 of Article III of the Constitution of the state of Montana. The plaintiff is not denied the equal protection of the law * * * nor is he deprived of his property without due process of law." (See, also, 3 Pond on Public Utilities, sec. 744.)

Although plaintiff in the *Barney Case* did not seek to become a common carrier for hire, as does the plaintiff here, it will be observed that the court dealt with the considerations involved in this case. It may fairly be said that the quoted declaration of the court in the *Barney Case* is more applicable to the facts of the instant case than to those of the case in which it appears, because here the applicant actually seeks a certificate of convenience and necessity as a common carrier, while in the *Barney Case* the applicant sought to operate as a private carrier and prosecuted his action to restrain the board from interference, and not to compel the issuance of a certificate.

In the light of the above opinion and the numerous authorities cited therein, we conclude that there is no merit in plaintiff's contentions as to the unconstitutionality of Chapter 184, Laws 1931.

Section 6, Article XV, of the Constitution of Montana provides as follows: "No railroad corporation, express or other transportation company, or the lessees or managers thereof, shall consolidate its stock, property or franchises, with

any other railroad corporation, express or other transportation company, owning or having under its control a parallel or competing line; neither shall it in any manner unite its business or earnings with the business or earnings of any other railroad corporation; nor shall any officer of such railroad, express or other transportation company act as an officer of any other railroad, express, or other transportation company owning or having control of a parallel or competing line.''

Plaintiff contends that the Act under consideration, as interpreted by the board, violates the above section of the Constitution, ''in that thereby it attempts and accomplishes indirect evasion of the requirement thereof that parallel transportation companies shall be and remain competitive in fact.''

In this case there is no consolidation of competing transportation lines. It cannot be said that the Northern Pacific Transport Company, a wholly owned subsidiary of the Northern Pacific Railway Company, is an ''other transportation company.'' (*Gallatin Natural Gas Co.* v. *Public Service Commission,* 79 Mont. 269, 256 Pac. 373; see, also, *North Bend State Line* v. *Department of Public Works,* 162 Wash. 46, 297 Pac. 780.)

Plaintiff cites the case of *State ex rel. Nolan* v. *Railway Co.,* 21 Mont. 221, 53 Pac. 623, 45 L. R. A. 271, in which this court dealt with the construction of the above constitutional provision. However, that case does not help us much here because the fact situation there was entirely different from the case at bar. In that case the court was considering an actual consolidation of two competing lines. Here there really is but one company, substituting one type of service for another. Hence it cannot be said that there was a consolidation.

The third and obviously the major question in the case involves the procedure and the ultimate action of the board. Plaintiff's very able and comprehensive brief tenders the issues and specifically directs attention to the essential provisions of the Act (Chap. 184, supra) by quoting the provisions necessary to consider in this case, viz.:

32

Section 2 (b): "It shall be unlawful for any corporation or person * * * to operate any motor vehicle for the transportation of persons and/or property for hire on any public highway in this State except in accordance with the provisions of this Act."

Section 3: "The Board of Railroad Commissioners is hereby vested with power and authority, and it is hereby made its duty to supervise and regulate every motor carrier in this State." ("Motor carrier" is defined in section 1 (h) as a carrier for hire on a commercial basis.)

Section 8 (a): "No Class A motor carrier, as in this Act defined, shall hereafter operate for the transportation of persons and/or property for hire on any public highway in this state without first having obtained from the board, under the provisions of this Act, a certificate declaring that public convenience and necessity require such operation."

Section 11: "Upon the filing of such application * * * the board shall fix a time and place for hearing thereon. * * * If after hearing upon application for a certificate, the board shall find, from the evidence, that public convenience and necessity require the authorization of the service proposed * * * a certificate therefor shall be issued. In determining whether or not a certificate should be issued, the board shall give reasonable consideration to the transportation service being furnished or that will be furnished by any railroad, or other existing transportation agency, and shall give due consideration to * * * the effect which such proposed transportation service may have upon other forms of transportation service which are essential and indispensable to the communities to be affected by such proposed transportation service or that might be affected thereby."

The contentions involved bring us to a consideration of one ▆ of the great fundamental principles of American government—the division of powers between the three co-ordinate departments, legislative, executive and judicial. The provisions of the Constitution of the United States classifying and declaring the powers of each department of government were

subjects of much debate and profound consideration by the Constitution framers. The solution of the matter as contained in the first three articles of the Constitution was so fundamental, so wise and so practical that the states of the Union, and many governments elsewhere, have recognized and adopted them. Article IV of our own Constitution is just as emphatic and more direct than is the Federal Constitution. Whereas the Constitution of the United States carefully enumerates and classifies the powers of the different departments without a direct expression (*State ex rel. State Publishing Co.* v. *Smith,* 23 Mont. 44, 57 Pac. 449, 451), the Montana provision is both direct and emphatic, as witness the language: "The powers of the government of this state are divided into three distinct departments: The legislative, executive, and judicial, and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any powers properly belonging to either of the others, except as in this constitution expressly directed or permitted." (Art. IV, sec. 1.)

Even before statehood, the matter was given consideration by the courts of the territory. In *Godbe* v. *McCormick,* 1 Mont. 105, the supreme court said: "A division of the powers of government among three co-ordinate departments, as in the federal constitution, the several state Constitutions, and in our own organic act, is most wise and salutary, and that each branch should be restricted within its own sphere of action, is a truism, but to determine the precise boundary between the several departments is sometimes attended with great difficulty."

From the beginning of statehood, the theory of independent departments of state has been a fruitful source of judicial investigation and declaration, but always the judicial department has refused to coerce or restrain either of the other departments so long as it was acting within its proper sphere and regularly in accordance with lawful authority. The courts have carefully refrained from interfering with the essential prerogatives of the legislative department. In speaking of the

right of each house of the legislative assembly to judge the qualifications of its own members, this court said: "Its decision, right or wrong, is conclusive upon us." (*State ex rel. Ford* v. *Cutts,* 53 Mont. 300, 163 Pac. 470.)

Times without number the aid of the courts has been sought to compel the discretion of state officers and boards, but always unsuccessfully. In speaking of the powers of the Governor as chief executive of the state, the court said: "While the supreme executive power of this state is vested in the Governor, * * * he is forbidden to exercise any legislative function except that granted to him expressly by the * * * Constitution." (*Mills* v. *Porter,* 69 Mont. 325, 222 Pac. 428, 430, 35 A. L. R. 592.) Speaking of the powers of the state board of land commissioners, this court said: "Since it is vested with discretionary power in that behalf, and since its discretion is invoked whenever it is called upon to confirm or reject a sale, this court cannot compel it to exercise that discretion in any particular way." (*State ex rel. Gravely* v. *Stewart,* 48 Mont. 347, 137 Pac. 854, 855.) In the consideration of acts of the state board of equalization, this court said: " 'Courts cannot be called upon, in every instance, to settle differences of opinion * * * between the assessing officers and the property owner. Otherwise, courts would be converted into assessing boards, and, in assuming to act as such, would usurp the powers lodged elsewhere by the lawmaking branch of the government.' Where a board has acted within the law, even though the result reached is clearly unjust and erroneous, mandamus will not be granted unless bad faith or dereliction of the official clearly appears. * * * Nor can the court inquire as to the operation of the minds of the taxing officials in fixing values." (*State* v. *State Board of Equalization,* 56 Mont. 413, 185 Pac. 708; see, also, *State ex rel. Snidow* v. *State Board of Equalization,* 93 Mont. 19, 17 Pac. (2d) 68.) In the last-cited case this court used language of unmistakable intent and specifically adhered to the rule so long recognized in this state. (See, also, *State ex rel. Schoonover* v. *Stewart,* 89 Mont. 257, 297 Pac. 476.)

While innumerable cases might be cited to illustrate the theory of the division of powers and the right of an officer or board of the state to proceed in an exclusive manner with relation to the duties and powers lawfully imposed, we think that this court in the case of *State* v. *Smith*, supra, expressed views particularly applicable here. There it said: "The ultimate purpose was, by this system of counterchecks, to secure economy and prevent favoritism. It is not for us to say whether the provision is a wise one or not. These officers, acting within the sphere of their constitutional duties, are accountable, under their oaths, to the people only, just as are the individual members of this court, and it is no part of our duty to inquire into their motives in withholding their approval from the contract let by the board to the relator. If they have acted arbitrarily, if they have chosen to pervert the functions of their high offices to vile, partisan uses, or to the purposes of favoritism, as is suggested by the allegations in the affidavit, we have no power to restore their consciences, and bring them to a sense of their duty. The forum in which they are to be judged is the minds and consciences of the people, whose servants they are, and who alone can hold them responsible for the manner in which they perform their duties." This language is most applicable here in the light of the fact that the board of railroad commissioners is a body whose members are elected by the people.

Neither litigants nor citizens can complain because an officer or a board exercises a discretion specifically granted through legislative authority. If a power is unwisely given, it must be revoked by the same authority that gave it. This court cannot repeal nor restrict authority to perform such acts. The author of this opinion was a member of the legislative assembly which enacted Chapter 184, supra, here under consideration. He voted against the measure for reasons that seemed sufficient to him—the same reasons that are urged here for its nullification—but the Act, though passed against his vote, expresses the will of the legislative assembly, and so the desire and will of the people. It was clearly within his pre-

rogative as a legislator to vote against the extension of the power, but it is just as clearly beyond his legitimate functions as a member of the judicial department of the state government to vote to nullify that power. It is the law of the state binding alike upon those who favored its enactment and those then and subsequently antagonistic. (See, also, 3 Pond on Public Utilities, sec. 713.)

The contentions of plaintiff would seem to be that the board has no power to deny a certificate to an applicant who qualifies and shows himself able and capable of delivering and furnishing adequate service. Such a contention cannot stand in the face of the statute. The board is constituted the arbiter of who shall have a certificate. That it has this authority is obvious. This court in construing Chapter 154, Laws 1923, set that question at rest. The opinion quotes with approval from decisions of the courts of Maine and Vermont, and declares the right of the board to deny certificates of convenience and necessity. There can be no misunderstanding of the following language used by this court: "A power to grant a privilege by one is inconsistent with the possession on the part of another of an absolute right to exercise such privilege. The requirement that a person must secure leave from some one to entitle him to exercise a right, carries with it, by irresistible implication, a discretion on the part of the other to refuse to grant it, if, in his judgment, it is improper or unwise to give the required consent." (*Northern Pacific Ry. Co.* v. *Bennett,* 83 Mont. 483, 272 Pac. 987, 992.)

Plaintiff asserts that the board in "parceling out motor transportation routes," and particularly in this case, has adopted the policy that railroads should be given the preference. The board was bound to observe the provisions of the law. "To the extent that the statute * * * designates a method of procedure, to that extent it constitutes the rule and guide for the board's action." (*State* v. *State Board of Equalization,* 56 Mont. 413, 185 Pac. 708; *Northern Pacific Ry. Co.* v. *Bennett,* supra.) The statute says that the board must give "reasonable consideration" to existing transportation

facilities, including railroads. This means that the board must inquire into the facts having relation to an application, and finally rule in the light of all of the facts, including those with reference to the railway service. Nor does the statute stop with the injunction to consider the existing conditions, but it commands a consideration of the service "that will be furnished by any railroad, or other existing transportation agency, * * * and the effect which such proposed transportation service may have upon other forms of transportation service," etc. This provision in the law is doubtless based on the principle discussed in the note and annotation appended to the case of *Chicago R. Co.* v. *Commerce Commission,* 336 Ill. 51, 167 N. E. 840, 67 A. L. R. 938, note at page 957. There the general rule is announced in the following language: "The general rule is that a certificate may not be granted where there is existing service in operation over the route applied for, unless the service is inadequate, or additional service would benefit the general public, or unless the existing carrier has been given an opportunity to furnish such additional service as may be required." (See long list of authorities cited in note.)

The provision above was understood by this court when it passed upon the constitutionality of Chapter 184. (*Barney* v. *Board of Railroad Commissioners,* supra.) There the court was considering the Act in its entirety, but quotations were made from cases wherein the effect upon freight service was discussed. There can be no question about the right of the board to consider such matters. (*Vander Werf* v. *Board of Ry. Commissioners,* 58 S. D. 586, 237 N. W. 909; see, also, 3 Pond on Public Utilities, sec. 731, and cases there cited.) In fact, a showing that the board had not considered these elements would be met by an order of this court commanding such consideration. (*State* v. *State Board of Equalization,* 56 Mont. 450, 185 Pac. 708, 186 Pac. 697.)

Plaintiff asserts that only the interests and welfare of the railroads were considered. The record does not bear out this assertion. The record contains much evidence on all phases

of the controversy. There is ample evidence in the record to justify the granting or refusal to grant either application. That the board considered all of the evidence and did not base its finding solely upon the rights of the railway company is made manifest by the orders of the board.

Plaintiff's application was denied at a time when trains Nos. 187 and 188 were running, and the order recites the following reasons for denying the certificate: "Regard for population, volume of traffic, cost of service and public need." These elements were proper subjects for consideration and they certainly do not substantiate the charge that public interest was ignored and only the rights of the railway company considered. (*State* v. *Public Service Com.*, 327 Mo. 249, 37 S. W. (2d) 576, 75 A. L. R. 232; *State* v. *Public Service Com.*, 324 Mo. 270, 23 S. W. (2d) 115; 42 C. J. 687; *In re Beasley Bros.*, 206 Iowa, 229, 220 N. W. 306.)

Between the date of the ruling on the Fulmer application and the ruling upon the transport company application, the hearing occurred on the application of the railway company to discontinue the trains. When the certificate of convenience was granted to the transport company, the conditional consent to discontinue the trains had been granted. Conditions had changed. Voluminous and comprehensive facts were set out in the order as the reasons therefor.

Much discussion appears in the briefs as to the relation of the several applications and hearings. On the one hand, it is asserted that each application is independent of the other, and, on the other hand, it is asserted that the whole series really constituted but one case. The board rested under the mandate of the statute to consider all applications in the light of existing conditions, and further to consider the effect which any proposed service might have upon a service then being furnished by a "railroad or other existing transportation agency." The board was not at liberty to consider the Fulmer application alone, or even in the light of other existing service; the statute required that it consider such other service as the railway might be willing to furnish. (Compare 3 Pond on

Public Utilities, 3d ed., sec. 731; *Vander Werf* v. *Board of Ry. Commrs.*, supra; *Stark Electric R. Co.* v. *Public Utilities Com.*, 118 Ohio St. 405, 161 N. E. 208.)

While the board very properly preserved the identity of the different applications, its various orders are replete with references to facts and findings of a more or less general character. In each order the general as well as the specific facts were covered and adopted as a basis for the particular finding. No more practical course could have been pursued to meet the requirements of the law and at the same time preserve individual records.

What has been said of the procedure is for the purpose of showing that the record discloses that the board proceeded in accordance with law. We think it did so and that its orders were based upon substantial evidence. That being true, it follows that the court below was right in its refusal to grant the relief sought. (*Billings Utility Co.* v. *Public Service Com.*, 62 Mont. 21, 203 Pac. 366, 368; *Northern Pacific Ry. Co.* v. *Bennett*, supra.)

It must not be understood that the courts have no function at all in such matters. Such a view would nullify the statutory provisions for a judicial review of the action of the board. The courts have a measure of judicial authority in matters such as the one under consideration. The law specifically authorizes such review of the acts of the board. The review, however, has been held by this court to include only the following questions: (1) Did the board act beyond the power which it could constitutionally exercise? (2) Did the board act beyond its statutory power? and (3) Did the board base its action upon a mistake of law? This court has qualified the above rule by the following language: "But questions of fact may be involved in the determination of questions of law, so that an order, regular on its face, may be set aside if it appears that the rate is so low as to be confiscatory and in violation of the constitutional prohibition against taking property without due process of law; or if the Commission acted so arbitrarily and unjustly as to fix rates contrary to evidence,

or without evidence to support it; or if the authority therein involved has been executed in such an unreasonable manner as to cause it to be within the elementary rule that substance, and not the shadow, determines the validity of the exercise of the power." (*Billings Utility Co.* v. *Public Service Com.,* supra.)

The function of the court in these matters should not be minimized. Without some supervision, efficiency would often be sacrificed to expediency, and administration would be lacking in uniformity and equity. It is a fundamental fact that great enterprises, both governmental and private, must proceed regularly and impartially. They will seldom do so automatically. While this court cannot function for the board, it can require that it proceed in reasonable accord with statutory requirements and established principles of practice.

Some question as to the sufficiency of the title of the Act ▮ (Chap. 184, supra) was suggested after the argument of the appeal in this court. This matter was not presented to the trial court, hence it had no opportunity to pass upon it. No assignment of error was, nor could have been, made with reference to it on appeal, and no mention thereof occurred either in the briefs or on oral argument. Were we to act upon the suggestion and find it meritorious, we would be compelled to reverse the judgment on a ground not advanced to nor considered by the lower court in arriving at its conclusion. Under the circumstances, therefore, we have refrained from a discussion of the point and do not now assume to pass upon it.

No error appearing, the judgment is affirmed.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES MATTHEWS and ANDERSON concur.

MR. JUSTICE ANGSTMAN: I dissent. Heretofore this court has held that Chapter 184, Laws 1931, is valid as against certain constitutional objections. (*Barney* v. *Board of Railroad Commissioners,* 93 Mont. 115, 17 Pac. (2d) 82, 88.) The

majority opinion in that case sustained the Act, saying: "In our opinion the Act constitutes a proper exercise of the police power of the state in the regulation of the use of the public highways by contract carriers, and is not to be condemned under the provisions of the Fourteenth Amendment to the Constitution of the United States, or like provisions embodied in section 27 of Article III of the Constitution of the state of Montana." I thought the Act was unconstitutional, as disclosed by my dissenting opinion in that case. I have not receded from the views there stated.

But if we treat the statute as one regulating the use of the highways as held by the majority opinion in the *Barney Case,* there are certain portions of the statute that cannot stand under any conceivable theory. The act contemplates that all motor carriers for hire shall be placed under the jurisdiction of the board of railroad commissioners, and none shall be permitted to operate for hire without first obtaining a certificate of public convenience and necessity. The rates to be charged for the services rendered are to be fixed by that board, and, in so doing, "the board shall take into consideration the kind and character of service to be performed, the public necessity therefor, and the effect of such tariff and rates upon other transportation agencies, if any, and as far as possible avoid detrimental or unreasonable competition with existing railroad service." (Sec. 3.)

And the board, in determining whether to issue a certificate of public convenience and necessity, is commanded to "give reasonable consideration to the transportation service being furnished or that will be furnished by any railroad, or other existing transportation agency, and shall give due consideration to the likelihood of the proposed service being permanent and continuous throughout twelve (12) months of the year and the effect which such proposed transportation service may have upon other forms of transportation service which are essential and indispensable to the communities to be affected by such proposed transportation service or that might be affected thereby." (Sec. 11.)

It is, of course, obvious that provisions in the Act designed to secure railroads against harmful competition have nothing to do with regulating the use of the highways in the interest of their preservation or the safety of the public. Such provisions have but one object, and that is to place a protecting mantle over the business of the railroad companies.

It is true that rail carriers, in common with other forms of business, have suffered financially during the period of the financial depression. It may be that the rail carriers as a matter of public policy should be protected against competition by motor carriers. That is a question not before us. My position in that regard is that, if this is a matter that may be accomplished by legislative action without constitutional amendments, it still must be done in a constitutional manner.

The title to Chapter 184 reads: "An Act Providing for the Supervision, Regulation and Control of the Use of the Public Highways of the State of Montana by Motor Carriers Engaged in the Transportation by Motor Vehicles of Persons and Property for Hire Upon the Public Highways of the State of Montana; Conferring Certain Jurisdiction Over Such Transportation, Motor Vehicles and Their Operations, Upon the Board of Railroad Commissioners; Providing for the Enforcement of This Act and the Punishment for Violation Thereof; and Repealing Chapter 154, Laws Eighteenth Legislative Assembly, 1923, as Amended by Chapter 103, Laws Nineteenth Legislative Assembly, 1925, and as Amended by Chapter 141, Laws Twenty-first Legislative Assembly, 1929." It will be seen that there is not the slightest intimation or suggestion in the title that the Act would deal with the question of whether railroads should be protected against competition by motor carriers.

Section 23, Article V, of the Montana Constitution, provides: "No bill, except general appropriation bills, and bills for the codification and general revision of the laws, shall be passed containing more than one subject, which shall be clearly expressed in its title; but if any subject shall be embraced in any Act which shall not be expressed in the title, such Act shall

be void only as to so much thereof as shall not be so expressed.''

This constitutional provision has been before this court on many occasions. Its purposes are ''to restrict the legislature to the enactment of laws the objects of which legislators and the public as well may be advised of, to the end that any who are interested, whether as representatives or those represented, may be intelligently watchful of the course of the pending bill. The limitation is likewise designed to prevent legislators and the people from being misled by false or deceptive titles, and to guard against fraud in legislation by way of incorporating into a law provisions concerning which neither legislators nor the public have had any intimation through the title read or published.'' (*State* v. *Anaconda Copper Min. Co.*, 23 Mont. 498, 59 Pac. 854, 855.)

As was said in *State ex rel. Holliday* v. *O'Leary*, 43 Mont. 157, 115 Pac. 204, 206, it ''was early discovered that ambitious or designing legislators, prompted by selfish motives or motives of less merit, procured the enactments of measures by reason of their high-sounding or popular titles, when in fact the title merely cloaked a purpose contrary to that expressed; and it was to prevent the members of the Legislature and the people generally from being thus imposed upon that these provisions have been adopted.''

To summarize, then, it is my opinion that, if Chapter 184 is valid as a statute designed for the purpose of regulating the use of the highways, as held in the majority opinion in the *Barney Case*, only such portions of the Act as are germane to the subject expressed in the title can be sustained.

Incongruous matters, such as the effect upon the profits of rail carriers and prevention of competition to railroads, cannot be sustained, because they are entirely foreign to the purpose of the Act as disclosed by its title. They inject into the Act a subject matter which, if it stood alone, would render the Act invalid on other constitutional grounds. They have nothing to do with the safety of the public or the excessive use of the

highways, which is the only foundation upon which any part of the statute can rest.

But if we treat the Act as valid in all respects, it does not, in my opinion, justify the action of the board of railroad commissioners in this proceeding. It must be conceded, of course, that the Act has for one of its purposes that of protecting railroads against detrimental competition. Sections 3 and 11 of the Act make this apparent. But it should be noted that the Act does not deal with railroads as motor carriers. It specifically defines "railroad" as a road for the "movement of cars on rails." (Subd. (k), sec. 1.)

The Act does not in set terms command that foreign corporations, subsidiary of a railroad company or otherwise, shall have preference over Montana citizens in the right to use the highways or to obtain a certificate from the board of railroad commissioners. It is silent as to the priority of rights of rival applicants for a certificate of public convenience and necessity. Ordinarily, the priority of time in making application, while not controlling in the absence of statute on the subject, is an element to be considered by the board. (*Chicago Motor Bus Co.* v. *Chicago Stage Co.*, 287 Ill. 320, 122 N. E. 477; *State* v. *Department of Public Works*, 165 Wash. 556, 6 Pac. (2d) 64; 3 Pond on Public Utilities, sec. 823.)

The action of the board in this case is based upon the supposition that the railroads have a monopoly on the transportation business. That this is so is seen from the fact that the board assumed that the transport company, a subsidiary of the railway company, had the right to base its application for a certificate upon the condition that trains Nos. 187 and 188 would be discontinued. If these trains were operating at a loss, application to discontinue such service was, of course, a proper matter to be submitted to the board. (Compare *State ex rel. and to Use of Missouri Pac. R. Co.* v. *Public Service Com.*, 327 Mo. 249, 37 S. W. (2d) 576, 75 A. L. R. 232.)

It should be noted that the board of railroad commissioners has, in a case such as this, two functions to perform: First, it must determine whether public convenience and necessity

require motor service; second, if the first question is answered in the affirmative, then the board must determine which of two or more rival applicants is entitled to the certificate. Here the board never reached the second question. It determined, as to Fulmer, that public convenience and necessity did not require motor service. It specifically held that the application of the transport company stands on a different basis from that of Fulmer. In this, I think, the board was in error. The board acted on the theory that it had a right to issue a certificate to the transport company because it was offering motor service in lieu of, or as a substitute for, train service furnished by trains Nos. 187 and 188. The statute does not authorize this to be done. The only justification under the statute for issuing a certificate to any motor carrier is because public convenience and necessity so require. And in determining whether public convenience and necessity require it, the board is commanded to give reasonable consideration ''to the transportation service being furnished or that will be furnished by any railroad.'' This, of course, as applied to a railroad, means rail service and not motor service. It means that the paramount consideration is the convenience and necessity of the public. Service to the public, and not the profits of the railroads, becomes the pole-star. The board, however, in disposing of Fulmer's application, of its own motion continued hearing on the application of the transport company until the Northern Pacific Railway Company had its application heard to discontinue trains Nos. 187 and 188. It based its order upon the ground ''that the proposed substitution of service would result in a marked decrease in operating costs and at the same time provide more efficient service.'' The ''more efficient service'' referred to is that furnished by the railroad company and not that proposed by Fulmer. It found specifically that, if it denied the right to the railroad company to abandon its train service on trains Nos. 187 and 188, it would be obliged to deny the application of the transport company. It found, in effect, that, if the converse were true and it allowed the discontinu-

ance of these trains, the certificate would be issued to the transport company as a substitute service for the trains. The statute does not make provision for substituting motor for rail service. It does not give the railroads, or their subsidiaries, a right of priority over other applicants for motor service. To confer such extraordinary privilege, the statute should so provide in no uncertain terms. (*Rapid R. Co.* v. *Michigan Public Utilities Com.*, 225 Mich. 425, 196 N. W. 518; and compare *McLain* v. *Utilities Com.*, 110 Ohio St. 1, 143 N. E. 381.

The case of *New York Central R. Co.* v. *Public Utilities Com.*, 123 Ohio St. 370, 175 N. E. 596, 598, involved a statute substantially the same as ours. There, as here, the railroad company sought the right of motor service as a substitute for rail service, on the ground that it would result in better service at less cost. The court disposed of the contention by saying: "These and other arguments made by the applicant should be addressed to the Legislature rather than to the Public Utilities Commission and this court. The New York Central Railroad Company as an applicant for a certificate * * * to operate a line of motortrucks over the highways of the state, and thereby transport freight from place to place within the state, is in no better or different situation under the statute than any other applicant for such right and privilege."

But if the implied authority exists for permitting substituted service, it is still difficult to understand upon what theory the board denied Fulmer's application and granted that of the transport company. Fulmer's original application proposed freight service by motor-bus between Billings and Miles City. This was also the original proposal of the transport company, coupled with the condition that trains Nos. 187 and 188 be discontinued. These trains were not freight trains; they were passenger trains carrying some property by express. They did not run between Billings and Miles City, but between Billings and Forsyth—an intermediate point. Both applications were subsequently supplemented to include passenger service. Fulmer in his application offered store—door pick-up and delivery

service. The transport company only offers station to station service.

I fail to see how under any conceivable theory the application of the transport company stood on any different basis from that of Fulmer as to that segment of the proposed route from Forsyth to Miles City. Between these points there was no train service discontinued, and the certificate to the transport company, as to this segment of the proposed route, cannot rest on substituted service. Also I fail to see how the discontinuance of passenger trains would give rise to a necessity for the substitution of freight motor traffic. In any event, if the discontinuance of these trains gave rise to a new condition affecting the question of public convenience and necessity, then final ruling on Fulmer's application should have been postponed on the board's own motion, in like manner as was the transport company's application, until such time as the question of the discontinuance of the trains was ruled upon. In other words, until that time the application of the transport company stood in exactly the same situation as did that of Fulmer. After permitting the discontinuance of the train service, the board should then have determined which of the two rival applicants was entitled to the certificate, where, as here, it holds in effect that public convenience and necessity require motor service. This, as above pointed out, the board did not do.

I concede, of course, that under the statute, where a certificate has been issued to a motor carrier and it is rendering adequate service to the public, the board has the right to exclude other motor carriers from the field, and to that extent regulated monopoly has been substituted for unrestricted competition. But that is not the situation here. I find nothing in the statute from which it can be said that the legislature intended to confer upon the railroads the right to a preference over other applicants for certificates for motor service, whether the question is presented on application for substituted service or otherwise. The majority opinion fails

48

to recognize the distinction between the exercise of reasonable discretion by the board and the granting of unwarranted favoritism.